J. P. C. PETROLEUM CORPORATION v. VULCAN STEEL TANK CORPORATION.

VULCAN STEEL TANK CORPORATION v. J. P. C. PETROLEUM CORPORATION.

Nos. 2137, 2138.

Circuit Court of Appeals, Tenth Circuit.

March 24, 1941.

Harry O. Glasser, of Enid, Okl., for appellant and cross-appellee.

Edward P. Marshall, of Tulsa, Okl. (J. J. D. Cobb, of Tulsa, Okl., on the brief), for appellee and cross-appellant.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

BRATTON, Circuit Judge.

J. P. C. Petroleum Corporation, hereinafter called plaintiff, sued Vulcan Steel Corporation, a corporation ·engaged at Tulsa, Oklahoma, in the business of manufacturing tankage and refinery equipment, hereinafter called defendant. These facts constituted the background of the litigation. J. Dudley Clark, an investment banker and broker, purchased from J. Edward Jones, a dealer in oil and gas leases and royalties, an interest in certain oil and gas leases in the Rodessa Field in Louisiana. Jones retained an interest in the properties, and Tom Potter, a driller and producer, also had an interest in them. At the time Clark purchased his interest, three wells had been or were being drilled, and others were to follow. They were distillate wells, and it became generally known that in all probability the state would on or about January 1, 1937, close all distillate wells unless an outlet was provided for the dry or residue gas. Faced with that situation, Clark, ·Jones and Potter, turned their attention to the matter of erecting an absorption plant for the separation of the dry gas from the distillate. In October, 1936, W. S. Smith, a dealer in oil field equipment at Tulsa, arranged for Clark, Jones, Potter and one Snowden to meet R. B. Millard, chief engineer of defendant, at Britton, Oklahoma, examine a plant which had been designed by Millard, and confer in respect to the construction of a plant. The parties met, examined the plant, and conferred. Thereafter defendant submitted two proposals for the construction of a plant, one dated November 17, 1936, and the other February 8; 1937. The proposal of February 8 provided that the cost of the plant should be $112,350, payable $15,000 upon the acceptance and signing of the contract,

$15,000 thirty days later, and the balance in subsequent periodical installments; that the deferred payments should bear interest at seven per cent per annum; that if defendant should desire and require, all deferred payments should be evidenced by promissory notes signed by plaintiff and endorsed by its guarantors; that plaintiff should secure and assign to defendant a lease upon the process area, should likewise secure and assign casinghead gas purchase contracts covering the producing wells, should furnish for examination abstracts covering such process area and leases, and should assign the gross proceeds resulting from the operation of the plant with provision that defendant remit to plaintiff out of such proceeds a sum not to exceed one cent per gallon of gasoline sold; that all provisions in the agreement, including the deferred payments should be guaranteed by Clark and Potter whose signatures should appear appended thereto immediately below that of plaintiff; that the proposal, made in duplicate, should become a contract and be binding when accepted by plaintiff and approved in writing by defendant; and that the contract, with the specifications and drawings therein referred to, should constitute the whole agreement. Jones represented to Forrester Clark and George Clark, sons of J. Dudley Clark, that if the proposal signed by plaintiff, which was then being organized by Clark, Jones and Potter, and a check for $15,000, being the cash payment required by the proposal, were sent to defendant, United Gas Company would agree to accept their residue gas and thus provide a needed outlet for it. On March 17, George Clark, who was to become and did become vice president of the corporation, gave his personal check for $16,000, payable to plaintiff; Jones wired defendant that a check for the initial payment on the contract was being mailed and stated that his associates were anxious that the work be expedited; and the check of plaintiff for $15,000 was mailed, and reached defendant on the 19th. Part of the balance of the check given by George Clark was used to defray the expenses incurred in the incorporation of plaintiff. On April 2, the proposal of February 8, in duplicate, accepted by plaintiff in writing but without the signature or other guaranty of Clark and Potter, was forwarded to defendant and was received on April 5. The president of defendant corporation approved one copy in writing and placed it in the hands of Millard with direction to return it to plaintiff in the event the notes came endorsed by Clark and Potter. The check had not been and was not then cashed, but was held. Defendant prepared and completed detailed plans, specifications and designs for fabrication, assembly and erection of the plant; and commencing March 18, it placed orders with other manufacturers for material and equipment needed in erecting the plant, and it also began fabricating in its own plant certain items of equipment. On April 17, defendant wired Jones that it would expect a check covering the second installment of $15,000 and the notes for the balance of the deferred payments by the following Monday. Potter endorsed the notes with the understanding that they would not be delivered until Clark had also endorsed them; Clark did not endorse them, and they were not delivered to defendant; the copy of the proposal bearing the approval of defendant was not returned to plaintiff; and on or about April 20, Clark advised defendant that the entire proposal was ended, the evidence being in conflict as to whether the reason given was inability to obtain an outlet for the residue gas or recent discovery of doubt concerning title to the leases. On the same or following day, defendant deposited the check of $15,000 in a bank at Tulsa, and it was cleared by air mail and paid.

Plaintiff sought judgment for the amount of the check. Defendant counterclaimed for the profit it would have earned had the contract been carried out, and for recoupment for certain obligations and expenses incurred in the amount of $13,278.38. The cause was tried to the court without a jury. The court found and determined that the parties understood that the plant would not be erected unless plaintiff was able to find an outlet or market for the residue gas, and that no outlet could be obtained; that the parties failed to comply with many of the terms involved in the proposal; that the check was advanced as good faith money during the negotiations for the completion of the contract; that the execution and delivery of the notes, endorsed by Clark and Potter, was the basis upon which the contractual relations were to be created and established; and that the parties did not consummate a final contract. Judgment was entered for plaintiff for the $15,000, less certain expenses in the aggregate amount of $7,595.82 which defendant had

incurred "at the plaintiff's instance and request". Included in such expenses were an item of $3,500 paid to Millard, and an item of $1,500 paid to Smith and his associate as a commission or brokerage. Defendant appealed from that part of the judgment in which it was held that no binding contract had been consummated and concluded, and plaintiff appealed from that part which charged it with the two items just mentioned.

Defendant challenges the finding and conclusion of the court that the parties understood that the plant would not be erected unless an outlet be obtained for the residue gas, that no outlet could be obtained, and that no binding contract was consummated and concluded. It is argued that the proposal of February 8 ripened into a written contract, that it was complete on its face and in addition provided that no other understanding existed, that it could not be devitalized by a contemporaneous understanding resting in parol, and that the evidence adduced upon the issue failed to show that an outlet could not be secured. The proposal appeared to be complete; it provided that no other understanding existed; and it also provided that it should become a binding contract when accepted by plaintiff and approved in writing by defendant. Plaintiff accepted it in writing and returned it to defendant for approval in writing. Defendant approved one copy in writing but did not return it to plaintiff. Instead, it was held awaiting arrival of the notes. The execution of a written contract in the particular manner provided is not always essential to it becoming a binding agreement. The specified manner of execution may be waived. And a contract becomes binding where it is executed by one party, is forwarded to the other for execution or approval, is received and retained by the latter but never formally signed or approved by him, and both parties act in reliance upon it as a valid contract. Rock v. Fisher, 91 Okl. 220, 216 P. 668; Girard Life Insurance & Trust Co. v. Cooper, 162 U.S. 529, 16 S.Ct. 879, 40 L.Ed. 1062; Id., 8 Cir., 51 F. 332; First National Bank v. Sleeper, 8 Cir., 12 F.2d 228; Dunkel Oil Corporation v. Independent Oil & Gas Company, 7 Cir., 70 F.2d 967.

But the conclusion of the court that no binding contract was consummated did not rest exclusively upon the finding that construction of the plant was conditioned upon the securing of an outlet for the residue gas and that no outlet could be obtained. It had another and independent basis. The court expressly found as a fact that the parties did not comply with many of the terms of the proposal. One integral provision in the proposal was that notes evidencing the deferred payments should be executed by plaintiff, endorsed by Clark and Potter, and delivered to defendant. The payments aggregated almost one hundred thousand dollars. The corporation had no assets. Clark was a man of substantial wealth, and Potter was a large producer. The occasion for the provision and its importance to defendant are thus crystal clear. Plaintiff wholly failed to deliver the notes executed and endorsed in the manner required. Defendant therefore did not return to plaintiff the copy of the proposal with its approval appended thereto but withheld it. It is perfectly plain that defendant did not intend to waive the provision respecting the notes or consent that the contract should be consummated and become binding unless and until they were in hand. Since defendant did not waive that provision, and since plaintiff did not comply with it, there was no meeting of the minds upon it, and, in consequence, the proposal did not ripen into a binding contract and neither party was bound by it as such. Cf. Hartzell v. Choctaw Lumber Co., 163 Okl. 240, 22 P.2d 387; Atwood v. Rose, 32 Okl. 355, 122 P. 929; Griffin Grocery Co. v. Kingfisher Mill & Elevator Co., 168 Okl. 157, 32 P.2d 63; Bartholomew v. Clausen, 181 Okl. 88, 72 P.2d 718; O'Neal v. Harper, 182 Okl. 52, 75 P.2d 879; J. B. Klein Iron & Foundry Co. v. Midland Steel & Equipment Co., 183 Okl. 487, 83 P.2d 157.

Although the proposal did not mature into a binding contract, plaintiff repeatedly urged defendant to proceed with the work and to expedite it in every way. Pursuant to such request, and anticipating that the proposal would become a valid agreement, defendant went forward with the engineering services. Detailed sketches, drawings, designs, computations of capacities and pressures were prepared by Millard and an assistant under his direction. In addition, some materal was fabricated in the plant of defendant, and some was ordered elsewhere. Upon receiving notice that plaintiff would not go further with the proposal, defendant cancelled all of the orders possible but was required to

pay for certain material which was in process of fabrication. Having requested defendant to proceed with the work, and having subsequently declined to proceed further, plaintiff was liable for the reasonable value of the material fabricated in the plant of defendant together with the cost of the labor in such fabrication, and for the amounts which defendant was obliged to pay others for material being fabricated elsewhere. The deductions which the court made for them were proper and are not challenged.

■ The two items drawn in question are the $3,500 paid to Millard and the $1,500 paid to Smith and his associate. Taking up the first, Millard was regularly employed by defendant, at a stated salary, plus certain additions. There was evidence that sometime in February the two entered into a written contract which recited that Millard was in position to secure for defendant the contract for the construction of the plant for a price of $112,350, on the terms previously outlined herein, and provided that if he procured and turned such business to defendant, out of the sums received from plaintiff in payment for such plant, defendant should be reimbursed for the actual cost of all material and labor, plus ten per cent of such amount, that the balance in cash or notes should go to Millard, and that he should be allowed to draw from defendant $500 per month to be applied toward his profits to accrue from the contract with plaintiff, effective the date defendant approved the contract with plaintiff. He was not to draw his regular salary or other compensation during the execution of the contract covering the erection of the plant. But the agreement between Millard and defendant was conditioned upon defendant securing a contract for the erection of the plant. Therefore the agreement either never became effective or was extinguished upon the failure of plaintiff and defendant to enter into a contract for the erection of the plant. Meantime the engineering services had been rendered at the direction of defendant, in response to the requests and importunities of plaintiff. Upon its declination to proceed further with the proposed erection of the plant, plaintiff became liable for the reasonable value of such services. And since defendant paid Millard for his services, it does not make any difference whether the liability was direct to defendant or to Millard. If the latter, upon making settlement with Millard, defendant became subrogated to his rights in the premises. But the measure of the liability of plaintiff was the reasonable value of the services rendered, and no proof whatever was offered upon that question. Proof was adduced tending to show in a general way the length of time devoted to the preparation of the plans, specifications, drawings, and designs; but there was a complete absence of proof in respect of the reasonable value of such services.

■ We come to the deduction allowed for the $1,500 paid to Smith and his associate. Ordinarily unless it is expressly provided otherwise in the terms of the employment, a commission or brokerage fee is not due unless and until a contract satisfactory to the principal is actually executed or unless the broker is instrumental in producing a responsible person who is ready, able and willing to enter into a contract conforming to the terms outlined in the employment of the broker. And the only testimony adduced relating to the employment of Smith and his associate was that payment of the commission was conditioned upon defendant securing a contract for the construction of the plant. Repeating, a contract with binding effect was not executed. And, Smith was not instrumental in producing one ready, able and willing to enter into a contract and furnish guaranteed notes satisfactory to defendant. Therefore defendant was under no legal liability to pay him and his associate a commission or brokerage fee, and for that reason it cannot assert a right of recoupment against plaintiff for the amount paid.

Others contentions are advanced. We have examined them with care and find no merit in them.

The judgment is reversed and the cause remanded for further proceedings not inconsistent with the views expressed herein.