POSTAL UNION LIFE INS. CO. v. HENSLEY et al.

No. 32866.   Oct. 28, 1947.

Rehearing Denied Nov. 25, 1947.

*186 P. 2d 802.*

Keaton, Wells, Johnston & Lytle, of Oklahoma City, for plaintiff in error.

Little & Hoyt, of Oklahoma City, for defendants in error.

424

BAYLESS, J. This is an appeal from the district court of Oklahoma county wherein the plaintiffs, G. S. Hensley and Tom Pointer, d/b/a Tom Pointer Company, recovered a judgment against the defendant, the Postal Union Life Insurance Company, for a broker's commission in the sum of $1,400. The parties will be referred to as they appeared in the trial court.

The defendant is the owner of a business building in Oklahoma City. In May, 1940, Hensley, who was a real estate salesman and an employee of Pointer, wrote the defendant that he knew of a party who was interested in buying this property. The defendant, in answering this letter, stated that the asking price was $28,000 and that the company 'was prepared to give very liberal terms to a purchaser. Hensley then presented a counteroffer on behalf of the Colorcraft Poster Company, the prospective purchaser, and in this letter stated:

"Our rate of commission for handling a sale of this kind is 5% on the first $10,000 and 2½% on any amount thereafter, said commission being based on the amount finally agreed upon as the sale price."

Thereafter a great amount of correspondence was exchanged between defendant and Hensley in which Hensley made numerous proposals on behalf of Colorcraft, and defendant, in declining such proposals, made counterproposals. Throughout this correspondence it appears a number of times that any agreement for sale of the property would have to be approved by defendant's board of directors and the Insurance Department of California.

During the latter part of March, 1941, J. L. Maritzen, vice president of defendant company, came to Oklahoma City and a meeting was arranged with Hensley, the members of the Colorcraft partnership, H. L. Braucht and Robert D. Curran, and their attorney, Henry Griffing. At this conference the parties reached an agreement as to the purchase price, down payment, amounts and times of payment of future installments on the purchase price, rate of interest on deferred payments, time at which the deed and purchase money note and mortgage would be executed, and date for delivery of possession of the property. No contract or memorandum was executed at that time. It was agreed that Henry Griffing would prepare the written contract and submit it to the defendant for inspection by its attorneys and approval by the Insurance Department of California and the board of directors of the defendant company.

A few days later Griffing prepared the written agreement and delivered it to Hensley, who forwarded it to defendant on April 5, 1941. In the letter of transmittal, Hensley states:

"These documents are not signed and we are submitting them to you for approval. If this contract is approved you may either execute same in duplicate and return to me and I will have same executed here and collect the $560 . . . or you may approve the forms, return to me and I will have them executed here and return to you for execution together with their check."

On April 18, 1941, Hensley wrote the defendant advising that he had not received an answer to his letter of April 5th, and urging it to "secure approval and return the documents to this office for execution." On April 21st the defendant wrote Hensley:

"We are at present ironing out some matters with the Insurance Department. As soon as these are concluded we will be in a position to close the deal as outlined. There are one or two minor changes that have to be made in the contract, and we will notify you accordingly within the next week or ten days."

Hensley wrote to the defendant on April 28th, again urging speed in closing the deal. On May 2nd, the defendant wrote Hensley advising:

"The writer had another discussion with the . . . Insurance Department

yesterday, and every indication points to the matter being settled very quickly."

On May 9th, and again on May 16th, Hensley wired the defendant that clients were showing anxiety and that the deal must be closed at once. On May 21st Hensley advised defendant by letter as follows:

"As stated in one of my telegrams, the lease now held by the Colorcraft Poster Company on their present location expires July 1, 1941 and it will be necessary for them to give thirty days' notice to quit the premises . . .

"Please let me again call your attention to the fact that this matter must have your immediate attention."

On May 23rd, the defendant mailed the contract which had been prepared by Griffing to Keaton, Wells & Johnston, its attorneys in Oklahoma City. This letter states:

"There has been considerable delay in getting this contract sent to you due to our delay in getting the approval from the Insurance Department."

This letter requests the attorneys to examine the contract, particularly with regard to defendant's liability for any bond issue which might be "placed against the property after the date of signing the contract"; and they were advised to deliver the contract to Hensley if they felt that defendant's interests were full protected, and to advise Hensley that the contract was satisfactory for execution by the Colorcraft people.

On May 27th, Hensley wired the defendant:

"Must have wire answer my letter 21st today. Colorcraft deal."

On May 27th, defendant wired Hensley:

"Contact Keaton Wells & Johnston".

On May 27th, Keaton Wells & Johnston returned the contract to defendant, advising certain changes in the contract which go to the form and not the substance of the agreement.

On May 27th Hensley wired defendant:

"Johnston advises contract returned with comments. Suggest you wire him authority consult Colorcraft attorney work out suitable contract, have signed here return for signature."

On May 28th defendant wrote Keaton, Wells & Johnston advising them that the contract had been forwarded to them on May 23rd, for the purpose of having them review it and if they deemed it advisable, to change any of the terms and conditions. This letter states that the Hensley telegram had not been answered because the company did not desire to get into any extended exchange of correspondence with Hensley.

On May 29th, the defendant mailed the revised contract to Henry Griffing, stating in the letter of transmittal:

"This is your contract with a few slight changes suggested by our attorney to clarify a few points. If you approve the contracts as they are, please have both copies signed by the members of the partnership and return them to us so we may have them signed.

"Should there be any objection on your part to the corrected contract, will you kindly contact Mr. Johnston of the firm of Keaton Wells & Johnston and adjust any differences. . . ."

On June 4th Hensley called at the office of Keaton Wells & Johnston. Johnston suggested one or two minor changes in the contract. It was Mr. Johnston's understanding that Hensley was to have the contract redrafted to conform to these suggested changes.

On July 2nd, defendant wrote Keaton, Wells & Johnston requesting information as to the status of the contract. On July 18th Keaton, Wells & Johnston wrote the defendant advising that they had talked to Hensley who informed them that the parties had not determined definitely whether or not they wanted to sign the contract. On July 25th Keaton, Wells & Johnston

advised defendant, by letter, that the Colorcraft people had definitely decided not to purchase the property.

On November 18, 1941, Hensley wrote to the defendant requesting that he be paid a commission for handling this transaction. He stated:

"This deal was lost entirely by your delay. The deal was made fair and square insofar as it relates to the Colorcraft people. I think it was due to these conditions, as everything possible was done by me to close this sale."

It is plaintiff's theory that he earned his commission when he produced a prospective buyer with whom defendant entered into an oral contract for sale of the property. The authorities cited by plaintiff are cases where an oral contract for sale of property was entered into between the vendor and purchaser and the vendor later refused to carry out the contract, or it was impossible to complete the deal due to some fault on the part of the vendor.

While the parties had an understanding as to the price, terms of payment, etc., it was understood that the agreement had to be approved by the Insurance Department of California and the board of directors of the defendant company; and there is no indication that either of the parties considered themselves bound by the terms of the agreement prior to the execution of the written contract by both parties.

Hensley stated in his letter to the defendant, dated April 28, 1941:

"Of course you realize no deal is made until the necessary papers have been properly executed and delivered."

We think the Restatement of the Law of Agency, sec. 445, correctly states the law, and is decisive in the case at bar. It is:

" . . . The principal's promise to pay the broker a commission does not become binding unless the principal and the customer reach a present definitive oral or written agreement. The broker has not earned his commission, even though the principal and the customer have drafted a memorandum of their proposed agreement, if they did not intend such proposed agreement to be presently binding upon them and hence reserved signature of the memorandum for a later occasion; at this point if either the principal or customer withholds such final consent, no commission is due.

"Both in the case where the principal gives the broker all of his terms and where he gives him only part of the terms, if the principal and the customer reach an agreement which, although definite, is not binding because it is oral, the principal is subject to liability to the broker if the customer is ready and willing to perform at the time fixed for consummation of the transaction; after the oral contract has been made the principal cannot avoid payment to the broker by refusing to perform it. . . .

"Illustrations: . . . .

"2. P employs A, a broker, to procure a tenant. A procures T, who makes an oral and hence unenforceable agreement with P for a lease. P withdraws from the transaction, although T is able and willing to execute a lease. No lease is executed. A is entitled to his commission.

"3. Same facts as in Illustration 2, except that T and not P withdraws. A is not entitled to his commission."

8 Am. Jur., Brokers, sec. 187, p. 1100, states:

"A broker is not entitled to a commission, if, before a binding contract is executed, the person procured becomes unwilling to make the purchase and repudiates his oral contract or promise."

In Bemister v. Hedtler, 249 Mass. 40, 143 N.E. 818, 33 A.L.R. 579, the court held:

"The production by a broker of a customer able and willing to purchase does not entitle him to a commission if, before a binding contract is executed, the customer becomes unwilling to make the purchase."

In this case an oral contract of sale was entered into and the purchaser

made a down payment. However, the purchaser later refused to complete the sale. In the annotation found in 33 A.L.R. 581, it is said:

"The cases that have passed upon the question generally agree with the conclusion reached in the reported case (Bemister v. Hedtler) that the production of a customer able and willing to purchase does not entitle the broker to a commission if, before a binding contract is executed, the customer becomes unwilling to make the purchase."

If the defendant had been guilty of bad faith in delaying consummation of the agreement, the authorities cited by plaintiff would be applicable. There is no showing of any bad faith on the part of defendant. If the defendant was guilty of unreasonable delay, that would influence our decision, but there is no such showing. The proposed contract was mailed to the defendant on April 5th. On May 23rd the defendant mailed this contract to its Oklahoma City attorneys, stating that it had not been able to send the contract sooner due to delay in getting approval of the Insurance Department. Hensley was advised of the reason for this delay, by the defendant in its letter of May 2nd. Defendant's Oklahoma City attorneys took a reasonable time to examine the contract and mailed it back to the defendant on May 27th. The defendant revised the contract to conform to the suggestions of its attorneys, and on May 29th forwarded it to the buyers' attorney. The defendant was, and thereafter remained, ready and willing to consummate the contract, but it was prevented from doing so by the action of the prospective buyers in declining to sign the contract.

Plaintiff did a great deal of work in attempting to sell this property and it is unfortunate that the sale was not consummated. However, he contracted to sell the property for the defendant and having failed to do so through no fault of the defendant, he is not entitled to recover a broker's commission.

The judgment is reversed and the trial court is directed to enter a judgment for the defendant.

HURST, C.J., DAVISON, V.C.J., and RILEY, WELCH, CORN, GIBSON, and LUTTRELL, JJ., concur.

Rehearing Denied Nov. 25, 1947.