Franklin P. SMITH and John S. Adams, Appellants,

v.

GIBRALTAR OIL COMPANY, a corporation, Appellee.

No. 5626.

United States Court of Appeals Tenth Circuit.

March 6, 1958.

George H. Jennings, Sapulpa, Okl., for appellants.

Bryce A. Baggett and James D. Fellers, Oklahoma City, Okl., for appellee.

Before MURRAH, PICKETT and LEWIS, Circuit Judges.

MURRAH, Circuit Judge.

The question presented here is whether the appellants are entitled to a claimed brokerage fee or commission for their efforts to secure a "farmout agreement" for appellees upon certain prospective oil and gas acreage owned by Shell Oil Company.

Based on diversity jurisdiction, the trial court, applying Oklahoma law, held that the appellants did not earn the commission, and this appeal is from a judgment in favor of their principal, the appellee.

The operative facts are that appellant, Smith, who was the owner of oil and gas leases in Clark County, Kansas, adjacent to leases owned by Shell Oil Company, approached Shell's Area Land Agent concerning the drilling of a test well in the area. After negotiations, Shell's agent advised Smith that he would recommend to the Shell management that Shell contribute certain designated lease acreage (approximately 2,300 acres) and $15,000 dry-hole money for the drilling of a test well to a specified depth on a specified quarter section in the area. Thereafter, Smith, joined by co-appellant, Adams, entered into an oral contract with appellee, Gibraltar Oil Company, wherein Gibraltar agreed that if the appellants procured a contract with Shell to that effect, appellee would pay appellants $6,000 in cash and a one thirty-second of the oil and gas produced from the seven-eighths working interest in each of the leases assigned by Shell to Gibraltar for the performance of the contract. In a letter confirming the arrangement, Gibraltar stated that any agreement with Shell would be subject to the acceptance of Shell's seismic work by Gibraltar's geological department.

At a subsequent conference, arranged by appellants between responsible representatives of Gibraltar and Shell's Area Land Agent, at which appellants were also present, conditions of the bargain to be entered into were orally agreed upon.

A few days later, and on September 19, 1955, Gibraltar wrote Shell, stating that it "would be willing to drill or cause to be drilled" a well to an agreed depth in the specified area, in consideration of an assignment by Shell of its right, title and interest in the aforementioned oil and gas leases, and $15,000 dry-hole money. The letter further significantly stated that if these terms were acceptable to Shell, and "after entering into a formal agreement", Shell would allow Gibraltar to examine its seismic work covering the described leases.

Soon thereafter, Shell's Area Land Agent submitted to Gibraltar an unexecuted contract embodying the understanding of the parties, including conventional details. The contract was submitted in reply to Gibraltar's letter for its "consideration and execution", and with the "understanding" that the contract would not be presented to Shell's management "until our title work is complete". At that time, Shell's Area Land Agent had written authority to contribute the stipulated acreage and dry-hole money for the drilling of the test well. Without making any objections to the form or content of the proposed contract, Gibraltar's representatives came to Shell's office on October 24, to inform Shell that because of "certain pending mergers or consolidations with others", Gibraltar would be unable to execute the proposed agreement or drill the proposed well. On October 31, however, Gibraltar's representative called Shell's representative long distance to say that Gibraltar was still attempting to "salvage the deal" and felt that it would be worked into its new program, and asked for and was granted until November 7 to return the contract signed or unsigned. On November 7, Gibraltar's representative again called Shell to state that it had been unable to work the deal into its new program, but that a representative was going East and felt that he might be able to interest other parties in the deal. It asked for two additional weeks, but was informed by Shell's representative that it was not disposed to grant any further extensions. The unexecuted copies of the contract were thereupon returned to Shell and there were no further negotiations.

From these facts, the trial court concluded that the unsigned proposed contract submitted by Shell to Gibraltar conformed in all material respects to the antecedent understanding between the parties, and reasoned that if Gibraltar's refusal to execute it was the sole cause of the failure of consummation, the brokers would have earned their fee, for said the court, Gibraltar "cannot urge the failure of a condition precedent when such party itself prevents the fulfilling of such condition." But the court was nevertheless persuaded that Gibraltar's refusal to execute the proffered agreement was not the cause of the failure of consummation, since if it had done so, Shell would still have been free to reject it. In other words, the burden was on the broker-appellants to procure from Shell a written offer, the acceptance of which by the principal would become a binding and enforceable contract, and until this condition precedent was met, the principal was free to withdraw from the negotiations without liability.

■ It is of course fundamental, as stated in Section 445, Restatement on Agency, that in the absence of bad faith, "an agent whose compensation is conditional upon the performance by him of specified services or his accomplishment of a specified result, is not entitled to the agreed compensation unless he renders the specified services or achieves the result." And see Aetna Life Ins. Co. v. Home, 193 Okl. 478, 145 P.2d 189; Williams v. Seminole Oil & Gas Co., 171 Okl. 406, 43 P.2d 59; First Trust Joint Land Bank of Chicago v. Ferguson, 187 Okl. 48, 104 P.2d 427. The broker-appellants did not comply with the condition of their bargain to procure an enforceable contract upon their principal's terms—they did not achieve the specified result. And, the only question is whether by its conduct the principal has waived its right or is estopped to insist upon the conditions of its bargain.

The question when a broker earns his commission in an uncompleted transaction has claimed the attention of the Oklahoma courts many times without complete uniformity of reasoning or result. The latest expression of the Oklahoma court on the subject is Roberts v. Gardner, Clarke and Sullivan, Okl., 275 P.2d 245, where a nonexclusive agent produced a purchaser with a written acceptance of his principal's offer after the property had already been sold to another party. The court quoted from Scott v. Kennedy, 152 Okl. 165, 3 P.2d 907, 908, to the effect that in order for an agent to recover his commission for an uncompleted sale, it was necessary for him to (1) procure a ready, willing and able purchaser with a written agreement to buy, which upon acceptance by the seller, would become a binding and enforceable contract; or (2) present the purchaser to the seller so that an oral promise of the purchaser to buy may be accepted by the seller.

The Scott case went back to Gilliland v. Jaynes, 36 Okl. 563, 129 P. 8, 46 L.R.A., N.S., 129; and Reynolds v. Anderson, 37 Okl. 368, 132 P. 322, 46 L.R.A.,N.S., 144, for its authority, and undertook to distinguish similar facts from Bleecker v. Miller, 40 Okl. 374, 138 P. 809; Pliler v. Thompson, 84 Okl. 200, 202 P. 1016; Childs v. Moore, 57 Okl. 638, 157 P. 333; and Thornburgh v. Haun, 79 Okl. 103, 190 P. 1083, on the grounds that in each of those cases the broker earned his commission by presenting to the principal-seller a ready, willing and able purchaser whom the principal accepted, thus waiving a written offer or enforceable contract. The court was at pains, however, to point out that it was not enough that the agent merely found a ready, willing and able buyer.

Without citing any of its numerous predecessors, Postal Union Life Ins. Co. v. Hensley, 199 Okl. 423, 186 P.2d 802, 804, went directly to Comment d, following Section 445, Restatement on Agency, to the effect that although the principal and agent may come to a complete understanding, even to the point of drafting a memorandum, yet either party may withdraw short of consummation or the submission of a written offer; provided however, if the parties reach a definite oral agreement, and the customer is ready, able and willing, the principal may not withdraw or repudiate the oral contract without liability, even though such contract is for some reason unenforceable. In the Postal Union case, the customer withdrew without fault of the principal and the court denied recovery of the claimed commission on the grounds that the purchaser withdrew before the consummation of a binding contract. But the court was careful to observe that if the principal had been guilty of bad faith in delaying consummation of the agreement, the authorities cited by the broker would have been applicable. While these authorities are not cited in the opinion, they are referred to as those where the principal repudiated an oral contract or "it was impossible to complete the deal due to some fault" on his part. The court undoubtedly had in mind Bleecker v. Miller, supra; and Pliler v. Thompson, supra, and related cases, which embraced a species of waiver or estoppel to excuse the requisite definitive written or oral contract.

■ On the question of waiver or estoppel, Equitable Life Assurance Society v. Home, 184 Okl. 542, 88 P.2d 887, 889, presents an interesting analysis of the Oklahoma decisions. In that case, the broker neither procured a written contract nor personally presented the purchaser to his principal; and the court, faced with the rule of Gilliland, Reynolds and Scott, distinguished them on the grounds that in each of those cases, the principal did nothing to waive the right to insist upon a written offer, or prevent the broker from obtaining such an offer or presenting the buyer to the principal for the effectuation of an oral contract. The court rested the broker's right to his commission squarely on Bleecker v. Miller, supra, and the host of cases following it, stating that "the employer here precluded the broker from full and complete performance of his duties for

the sole reason that after the broker had obtained a suitable buyer and was prepared to present him to his employer, it concluded not to sell because of increased value or other reasons unassigned"; that such action was arbitrary and unjustified, and that the procurement of a written contract from the purchaser would have been vain and useless. And see also Hubbard v. Ryals, 187 Okl. 6, 100 P.2d 843; Anderson v. Hill, 196 Okl. 304, 164 P.2d 623; and cases collected 169 A.L.R. 605; 156 A.L.R. 602, 606. Otherwise stated, where the broker procures a customer who is ready, willing and able to contract on the principal's terms, the broker is entitled to his commission, unless the seller has "reasonable cause for not completing the transaction." Reeser v. Crawford, 147 Okl. 53, 294 P. 181; see also Sanders v. Matthews, 157 Okl. 223, 12 P.2d 873.

■ The rule is epitomized and restated in Comment e, following Section 445, Restatement on Agency, to the effect that although the commission is conditional upon the execution of an enforceable contract, the principal is nevertheless liable if the broker "procures a customer who is willing to enter into an enforceable contract with the principal on the principal's terms and whose failure to do so is because of the principal's refusal to execute such agreement." And see also Sections 294 and 295, Restatement on Agency: J. P. C. Petroleum Corp. v. Vulcan Steel Tank Corp., 10 Cir., 118 F.2d 713; Costilla Land Co. v. Robinson, 10 Cir., 238 F.2d 105.

■ ■ The Oklahoma cases leave us in some doubt of the true meaning of "bad faith", "fault" or "reasonable cause" as ingredients of waiver and estoppel. It seems clear, however, applicable law imposes upon the principal the duty of good faith in the bargaining process he has fashioned—a fealty which forbids him to withdraw from the negotiations with impunity. Certainly he may not stand in the way of the result he has commissioned his agent to accomplish. He is, to be sure, free to insist

upon his bargain for an enforceable contract, but he must stand upon that ground or show reasonable cause for refusing to execute a tendered contract upon his own terms. It is inadmissible, we think, to say for the first time in defense that even if Gibraltar had originally executed the tendered contract, Shell would still have been free to reject it. While Shell remained free to reject the contract, it had expressly authorized its Land Agent to contribute the dry-hole money and the acreage which was the subject of the negotiations. And, it prepared and submitted a contract embodying those very terms. In these circumstances, there can be little doubt that Shell stood ready, willing and able to contract on Gibraltar's terms. Without insisting upon the condition precedent, Gibraltar refused to execute the proffered contract solely for its own convenience. We think it is thereby estopped to exact a literal performance, and that the appellants earned their commission.

■ The appellees argue the statute of frauds, 15 O.S.1951, § 136, subd. 5, as a defense to the oral brokerage contract. There are serious doubts whether the defense was ever affirmatively pleaded or even injected into the trial of the case. And see Rule 8(c), Fed.Rules Civ.Proc. 28 U.S.C.A. In its answer, Gibraltar stated, referring to Paragraph 4 of appellant's amended complaint, that "any alleged contract that the plaintiffs had with the Shell Oil Company was oral and involved real estate, and is therefore void under the statute of frauds." But, it did not allege that the contract sued upon, if in existence, was oral and within the statute of frauds. In the report of the pretrial proceedings with reference to the pleadings, the attorney for Gibraltar stated, "we also plead the statute of frauds." Indulging in the liberality of pleadings, we may concede that the affirmative defense was properly raised. And, it is the law in Oklahoma, as elsewhere, that where the consideration for the broker's services is an interest in real estate, the contract therefore

is within the statute of frauds. See Hall v. Haer, 160 Okl. 118, 16 P.2d 83; Macsas v. Fishencord, 190 Okl. 407, 124 P.2d 388; Annotation, 151 A.L.R. 648.

█ This contract was oral and within the statute of frauds. But the trial court specifically found that the letter memorandum which followed confirmed the understanding of the parties. It identified the parties and embodied the subject matter of the agreement. It was signed by the party to be bound; it left no essential element resting in parol, and it was therefore legally sufficient to take the oral agreement out of the statute of frauds. See Thompson v. Giddings, Okl., 276 P.2d 229; Hawkins v. Wright, 204 Okl. 55, 226 P.2d 957.

In the view the trial court took of the case, it had no occasion to determine the measure or extent of appellee's earned commission. It did find, however, that Gibraltar agreed to drill the well and pay appellants $6,000 and one thirty-second override on the leases to be assigned in the event they procured the contract with Shell. Appellants apparently take the position that Gibraltar's failure to execute the contract with Shell and drill the well constituted a breach of the brokerage contract, and that the measure of damages is the reasonable cost of drilling the well, plus $6,000 and one thirty-second override.

██ True, the measure of damages for the breach of a contract to drill a well is the reasonable cost of doing so. See Dixon v. Dalton, 158 Okl. 178, 12 P.2d 1108; Smith v. Kious, 194 Okl. 17, 147 P.2d 442; Mid-Continent Petroleum Corp. v. Russell, 10 Cir., 173 F.2d 620. But we do not think this general rule has controlling application to our facts. To be sure, the drilling of the well was implicit in the whole transaction, but the proposal to do so did not run to the broker, but to Shell. The failure to consummate the drilling contract in these circumstances did not render Gibraltar liable to Shell or to the brokers, except to the extent of the broker's commission. As to that, we hold that the brokerage agreement was performed, but the cost of drilling the well was not a part of it. If the drilling contract had been consummated and performed, the broker's commission would have surely been $6,000 and one thirty-second override on the assigned leases. If the drilling contract had been consummated and breached, the broker's commission would have been the same. And, so it is here. Appellants are entitled to their commission as if the contract had been executed and performed. In any event, the full measure of the appellants' compensation is $6,000 and the reasonable value of the one thirty-second override on the leases which would have been assigned in the event of performance.

The case is reversed and remanded with directions to proceed in accordance with the views herein expressed.