**Louis J. ROUSSEL, Plaintiff in Error,**

v.

**O. P. RUSSELL, Defendant in Error.**

No. 38264.

Supreme Court of Oklahoma.

May 12, 1959.

Brewer & Meacham, Elk City, for plaintiff in error.

· T. K. Quillin, Oklahoma City, and J. T. Bailey, Cordell, for defendant in error.

BLACKBIRD, Justice.

The present appeal involves an oral agreement, under which plaintiff in error, hereinafter referred to as defendant, was to pay defendant in error, hereinafter referred to as plaintiff, his costs in procuring for defendant an oil and gas lease, or leases, on the undivided interests of persons in various branches of the Quigley Family, referred to as the "Quigley Heirs", comprising a 96 or 98-acre part of "the Northeast Quarter of Section Thirty (30), Township Ten (10) North, Range Twenty (20) W. I. M.", in Washita County, and said to be "on the edge" of the Elk City Pool or Field. On September 25, 1955, when the agreement was entered into, defendant, an oil and real estate operator of New Orleans, Louisiana, was about to complete a producing well in Section 30's Northwest Quarter, on land owned by a family named "Nutley." On the day in question, T. W. or "Spec" Cooper, who then lived in Oklahoma City, was making one of his frequent visits to the Nutley well (which had been drilled to a depth of some 9 or 10 thousand feet) to watch a drill stem test of said well. After Cooper's visit to the well, there was a long distance telephone conversation between him and the defendant, in the presence of Ervin J. Roussel, defendant's brother and drilling superintendent on the Nutley well, in which the possibility of defendant's obtaining an oil and gas lease on the Quigley Heirs' tract was discussed, and defendant told Cooper that if he could obtain it, defendant wanted a one-year lease on said tract with the idea of using the same rig being used on the Nutley tract, to drill an exploratory well on the quarter section containing the Quigley tract. Plaintiff then had a lease on the Quigley Heirs' interests that was about to expire. The arrangement, which, in the course of time was agreed upon between plaintiff, and Cooper, acting as defendant's agent, was that plaintiff would obtain the various Quigley Heirs' execution of a new one-year lease, or leases, to him, as lessee, paying them a bonus therefor of $10 per acre;

then he would assign these leases to defendant, reserving to himself a one-sixteenth overriding royalty interest ($\frac{1}{2}$ of which plaintiff would later assign to Cooper) for which leases defendant would pay him the cost thereof (the bonus plaintiff had paid for the leases, plus his expense in obtaining them) in an amount in the neighborhood of $1,000 or $1,200. During the course of plaintiff's endeavors to obtain leases from all of the Quigley Heirs, one of them, Neal Quigley, was killed in an auto accident. Plaintiff did not obtain all of the other heirs' signatures and acknowledgments on leases of their interests until the early part of the year 1956. On March 12, 1956, plaintiff wrote defendant, at New Orleans, the following letter:

"Pursuant to our understanding and agreement with Mr. T. W. Cooper of Oklahoma City, Oklahoma, we have at your direction secured commercial oil and gas leases dated September 30, 1955, for a term of one year covering 91.8 acres interest in the above tract. This includes all of the Quigley heirs, except Neil Quigley, who died and his estate is in the process of administration. We can acquire this interest, but it will cost an additional $100.00 as attorney fees over and above the lease cost to acquire it.

"The rest of the sixty (60) acre interest is scattered out to individual royalty owners in the State of Texas, who have indicated in letters to us, that they will execute oil and gas leases on this interest upon the firm commitment of an oil and gas well being drilled on the property.

"We have expended the sum of $10.-00 an acre or $918.00 for these leases, together with abstract bill of $44.00, making a total expenditure of $962.00.

"Under our agreement we are to assign you these leases for the actual consideration paid out by us, together with the reservation of $\frac{1}{16}$ of $\frac{7}{8}$ths of all oil and gas produced from the premises, free and clear of costs into the pipe line and we are ready to make this assignment at any time that you desire.

"We will further endeavor to obtain the balance of the oil and gas leases for you when you and your associates are ready to issue commitment for the drilling of the well and assign such leases to you on the same basis."

Plaintiff received no direct answer, or reply, to said letter, and on June 14, 1956, he wrote defendant again, this time inclosing the leases he had obtained—some of them approximately eight months previously—from seven of the Quigley heirs, covering their interests in 91.8 acres, together with an assignment of same from plaintiff to defendant, and asking that defendant remit the $962 necessary to reimburse him for the above mentioned bonus and abstract expenses. Plaintiff received no reply of any kind to this letter, and thereafter, on September 10, 1956, commenced the present action to recover from defendant the $962, with interest.

To plaintiff's petition alleging many of the above delineated facts, and others unnecessary here to mention, defendant filed a general demurrer, and, when that was overruled, an answer in the form of a general denial, together with a special denial that either his brother, Ervin, or T. W., Cooper, was authorized to, or had acted as, his agent or representative in the contract plaintiff alleged, and sued upon. When the cause came on for trial before a jury, defendant objected to the introduction of any evidence on the ground that such alleged contract was unenforceable by reason of being indefinite, uncertain, and within the Statute of Frauds. This objection was overruled, and, at the trial which ensued, defendant testified that Cooper had never been in his employ. He further testified that the Nutley well was completed as a producer at a depth of 10,-600 feet, on October 15, 1955. He admitted that he had a telephone conversation with Cooper "one day" when Cooper was in the Elk City area (though he testified

that Cooper, rather than the witness himself had placed the call, as Cooper testified), and that, in said conversation, Cooper said Russell could get the Quigley lease "for a ⅟₁₆th override and approximately $1,000.00 of expenses * * * and he and Russell would submit * * *" the overriding interest. Defendant further testified:

"I told him that if they could do that before the rig was released on the Nutley, that I would take the deal under those conditions. The reason why I stressed the point that before the rig was released was because when that rig would finish drilling the well that it was drilling for me, they were going to move it away and to move another rig in there would cost a lot of money as drilling at Elk City was just about completed; the field had been drilled up."

Defendant opined that the above mentioned telephone conversation occurred in the latter part of September, 1955. When asked if he authorized Cooper, or his brother and drilling superintendent, to employ, or hire, Russell to get the Quigley leases, defendant testified:

"I didn't care if it was Joe Blow, if he could deliver the lease before we finished drilling the Nutley well and he could deliver a full ⅞ths, less ⅟₁₆th, and for not more than $1000.00 of expenses, it wouldn't have mattered if it would be Russell or Joe Blow, I would have taken the lease."

When asked if he had ever had a telephone conversation with plaintiff directly concerning the matter, and, if so, when, defendant answered in the affirmative, but stated he would not know the exact date thereof, but "would say * * * (it) took place in the latter part of September or the beginning of October * * *". Defendant further testified, concerning what was said in the conversation, as follows:

"After he (Russell) spoke to 'Spec' Cooper, he called me and told me he would have the lease all ready in the next few days and I again told Mr. Russell that unless the lease was delivered in full and delivered prior to the time that the rig had completed the Nutley well, that I would take it, otherwise, I wasn't interested."

Defendant further testified that he didn't answer plaintiff's aforesaid letter of March 12, 1956, because he considered "the matter closed when we moved the rig off of the Nutley well in October * * *", and that the letter reached him approximately "six months after that time." He further testified that plaintiff's letter of June 14, 1956, inclosing the lease papers, as aforementioned, was received by him "approximately eight or nine months after * *" the rig had been moved off of the Nutley well; that he did not accept, or record, the leases and assignment; and that they did not "comply with * * * (his) verbal discussions with * * *" plaintiff. Defendant further testified in substance, that he never agreed to pay plaintiff "or anyone" the expenses of obtaining the leases, if through them, he did not obtain the full interests of all of the Quigley Heirs prior to the rig's being moved away from the Nutley well.

At the close of plaintiff's evidence, and again at the close of all of the evidence, defendant interposed demurrers on the same grounds on which he had based his aforementioned objections to the introduction of evidence, with the addition of the specific charge that no attempt had been made to show that defendant had ever engaged T. W. Cooper as his agent except by parole (as some of the testimony adduced by plaintiff was contemplated to infer). After all of such objections were rejected by the trial court, and the cause was submitted to the jury, the verdict was for plaintiff, in the principal amount he sued for, but the court in the judgment thereafter rendered for plaintiff, added to said principal sum, the interest plaintiff sought.

The first part of defendant's argument under his first proposition of error is that the alleged oral agreement in

the present case was within the Statute of Frauds (Tit. 15 O.S.1951 § 136) and that there was not sufficient part performance of it to take it out of said Statute's operation. Plaintiff cites cases to the effect that said Statute has no application to a contract to pay a broker's commission. Here, however, plaintiff's commission was an overriding royalty interest; consequently those cases do not apply. See Macsas v. Fishencord, 190 Okl. 407, 124 P.2d 388, 389; Smith v. Gibraltar Oil Co., 10 Cir., 254 F.2d 518; Danciger Oil & Refining Co. v. Borroughs, 10 Cir., 75 F.2d 855, certiorari denied 295 U.S. 758, 55 S.Ct. 915, 79 L.Ed. 1700, and other cases cited in Summers, Oil & Gas, (Per. Ed.) Vol. 3, sec. 554, footnote 56. As to related matters, see Mershon v. Essley, 204 Okl. 660, 233 P.2d 293, 296, quoting Harris v. Tucker, 147 Okl. 210, 296 P. 397, 398, and other authorities.

Plaintiff presents a supplemental, or alternative, argument designed to show that if the Statute of Frauds had any application to such a contract, the one involved here was taken out of its operation by full performance. The full performance of which he speaks, however, relates only to performance by plaintiff himself, and concerns no undeniable or irrevocable act of acceptance, or partial performance by defendant, such as courts and text writers have apparently regarded as necessary to preclude operation of the Statute. In this connection, see 42 A.L.R. 10, 13, and 49 Am.Jur., "Statute of Frauds", secs. 419 et seq., and 430; but also see Love v. Kirkbride Drilling & Oil Co., 37 Okl. 804, 129 P. 858, 860, 861, citing Holland v. Hoyt, 14 Mich. 238; also Ascutney Bank v. Ormsby, 28 Vt. 721, cited in the Michigan case. We recognize the potential for fraud and injustice of any rule that would allow one party, merely by use of the mails, to force upon another, leases which the other does not want, and which are only a part of what he had offered to buy. On the other hand, however, there is grave injustice in the second party's inducing the first party to expend his own money to purchase, for second party, leases he may later refuse to accept, at a time when their speculative value has diminished, or disappeared, and there is then no market from which first party can recover his loss by the leases' resale, or assignment. As we view the situation in this case, however, the specific contract which plaintiff sought to enforce involves no conveyance of an interest in real estate by the defendant, who is the party "sought to be charged" within the meaning of the Statute. Section 136, subd. 5, supra; Hawkins v. Wright, 204 Okl. 55, 226 P.2d 957, 961, 962. The only promise on the part of the defendant, which, by this action, plaintiff sought to enforce, was a promise to repay the money he expended on defendant's behalf and at his behest. It was no defense to defendant that his original promise to buy the leases was not evidenced by written contract, or other sufficient writing or memorandum, or that the authority of Cooper (to whom he made the original promise) to act as his agent, was not in writing, or that the original offer or promise was a conditional one and not to be effective unless the leases were delivered to him before completion of the Nutley well and unless they covered the interest of all, instead of only most, of the Quigley Heirs. Minder & Jorgenson Land Co. v. Brustuen, 29 S.D. 562, 137 N.W. 282. As will be seen from defendant's own testimony about his telephone conversation with plaintiff, in September or October, he knew then that plaintiff was acting on the previous offer he made (through Cooper) to buy the Quigley leases, but he made no protest, nor did he disavow or rescind his offer, or object to Cooper's having relayed, or passed it on, to plaintiff, or to plaintiff's acting upon it. In this connection, notice Kneeland v. Shroyer, Or., 328 P.2d 753, 765. Furthermore, Cooper testified, among other things, that after Neal Quigley's death and plaintiff had contacted the witness to find out whether he should go ahead and forward to defendant the leases he had procured on the other heirs' interests, without waiting until Neal Quigley's estate

could be probated, the witness had three long distance telephone conversations with defendant. In the first one (according to Cooper) defendant told him, in substance, that, because of a project in which he was then engaged, involving production in another drilling unit, "to hold up the assignments and leases." Cooper further testified, that, in the second conversation, he had with defendant about thirty days later, after witness had reminded defendant that plaintiff was holding up on the stuff (leases) and "had his money tied up", defendant told him to have the leases "sent on down" to him. As to the last occasion, on which he telephoned to defendant after plaintiff had complained that he had forwarded the leases, together with his assignment, but hadn't received any word or reimbursement from defendant, Cooper testified that defendant therein acknowledged he had received said instruments, but stated that he had been out of town "a great deal" and was busy, but "in the next few days * * * would take care of it." Although, as hereinbefore noted, the defendant (by deposition) denied generally that he had ever agreed to pay anyone the expenses of obtaining leases on less than the interest of all of the Quigley Heirs, he did not directly, or specifically, deny that he had the telephone conversations described in the above mentioned testimony of the witness Cooper. The trial of facts, if it believed said testimony to be true, could have reasonably concluded that even though defendant's original promise included the procurement (at his expense) of an "interest in real estate" (overriding royalty) for plaintiff—after plaintiff had obtained the leases in his name, and thereafter, in June, 1956, had executed the assignment thereof, leaving, by reservation or exception, said interest or overriding royalty in his own name, defendant made a new promise which did not involve transfer of a real estate interest by him, or on his behalf, but only the payment, or repayment, of money which had been expended at his request and for his benefit. Though there are substantial differences in the facts in this case and the old English case of Green v. Saddington, 7 El. & Bl. 503, in 119 Eng.Reprint 1333, cited in the Annotations in 13 A.L.R. 271, 274, we think the following words of the court therein might well be said of the present case:

> "It therefore appears to us not to be within the Statute of Frauds, but, on the contrary, to be within the class of cases where, after the contract directly concerning the interest in land has been executed, the action has been held to lie upon a separate promise to be performed after such execution."

Whether the present action be regarded as founded on an express promise, or an implied one, or whether defendant's final promise to pay for the leases plaintiff had obtained, related back to, and was connected with, his original request for leases on the interests of all of the Quigley Heirs, or whether it be regarded as founded on quasi, or constructive, contract, we think that instead of being an action to charge a defendant on a contract to convey an interest in real estate—and within the Statute of Frauds—it is solely for the recovery of money paid, lent, or advanced, and is in the nature of assumpsit, in which actions for "money had and received" had their origin. See Am.Jur., Vol. 4, "Assumpsit", sec. 28, at note 16, sec. 22, at note 3, and Vol. 49, "Statute of Frauds", sec. 539, at note 15, sec. 556, sec. 563. In this connection, notice White v. Dickerson, 198 Okl. 214, 177 P.2d 113; Cone v. Ariss, 13 Wash. 2d 650, 126 P.2d 591; Smith v. Dunn, 165 Or. 418, 107 P.2d 985; Kennedy v. Conrad, 91 Mont. 356, 9 P.2d 1075, 1078, in which the court said: "* * * the rule is that, 'where one pays out money at the special instance and request of another, the law implies a promise on the part of the latter to repay it.' "; First Nat. Bank of Fairbury v. Fairchild, 118 Neb. 425, 225 N.W. 32, 35, in which the court refers to the action as one for "money advanced and paid for the use and benefit of defendants at their request and with an agreement

to repay,"; and, Schaeffer v. Miller, 41 Mont. 417, 109 P. 970, in which the court held that even when there is no agreement between the parties that one is to repay money advanced by the other on the purchase price of property, yet, where equity and good conscience required him to do so, the law implies a promise to that effect on his part. See also 58 C.J.S. Money Paid §§ 3(c) (2), 11a. As to related matters, see Rizkalla v. Abusamra, 284 Mass. 303, 187 N.E. 602, and 1 Am.Jur., "Accounts and Accounting", sec. 20, and the note at 45 L.R.A.,N.S., 541. In view of the foregoing, we conclude that Tit. 15 O.S.1951 § 136, subd. 5, does not apply to the present action; and, accordingly constitutes no sufficient basis for defendant's · charge that the trial court erred in overruling his respective demurrers to plaintiff's amended petition and evidence, and to the evidence as a whole.

■■ Under his Proposition II, defendant complains that his "substantial rights" were violated by the trial court's Instruction No. "(8)". Said instruction reads as follows:

"You are further instructed that the defendant Louis Roussel could if he desired have drilled a well upon the Quigley lease without having a lease from all the owners of the minerals under that tract."

Defense counsel say this instruction was an "abstract" one, and "highly prejudicial" to defendant's rights because it could have easily "swayed" the jury to disregard his contention that he was not interested in buying leases on anything less than the interests of all of the Quigley Heirs. Plaintiff's counsel denies that the instruction was abstract, and contends that it was made necessary to a full submission of the issues, and to prevent the jury from being misled, by defendant's testimony to the effect that without the leases from all of the heirs, he could have been prevented from drilling on the land by one or more from whom he had no lease. Defense counsel concede that the referred to part of defendant's testimony does not correctly state

the position of a lessee of part of the undivided interests in a tract of land; and they recognize that such lessee may drill on it, but say he is accountable, as a cotenant, to the owners of the unleased interests for their pro rata share of the profits therefrom. They further say that the trial court should have instructed the jury to that effect, and they infer that then the jury could have seen from defendant's testimony as to the number of years it takes wells in that area to "pay out", that "it would have been foolish * * * (from an economic standpoint)" for defendant to have drilled on the quarter section containing the Quigley interests with only 91.$^8$⁄₁₆₀ths of it under lease. We think this argument goes rather far afield and, without analysis, might prove misleading. We find no evidence in the record showing that a lessee's share of production from a well on said quarter section would be so much less if he owned leases on only a 91.8-acre part of it, instead of the full 96 or 98-acre part owned by all the Quigley Heirs, that one would be undesirable, as compared with the other; and we do not think any such consideration was a fundamental issue in the case. Defendant requested no such instruction, and, in view of the nature of the case and the evidence as a whole, we hold that the trial court committed no error in not giving such a one. Tit. 12 O.S.1951 § 578; National Tank Co. v. Scott, 191 Okl. 613, 130 P.2d 316, 321.

■ Under his Proposition III, defendant argues that the trial court erred in including in its judgment, in addition to the $962 awarded plaintiff by the verdict, the further award of interest on said judgment at 6% from June 14, 1956. Defense counsel refers to plaintiff's claim as an "unliquidated" one, and says that no interest should have been allowed him thereon for any period prior to the time the amount thereof was fixed by the judgment, citing Essley v. Mershon, Okl., 262 P.2d 417. In support of the trial judge's allowance of interest, plaintiff's counsel cites Independent School Dist. No. 65, Wagoner County v. Stafford, 208 Okl. 542, 257 P.2d

1092, 1095, wherein the court, in rendering judgment for the school teacher plaintiff in said action against the defendant school district for damages for breach of her written contract of employment, allowed her interest on the principal sum of her recovery from June 1, 1951, which was the date she filed her claims for salary under said contract. In affirming the judgment, we quoted Tit. 23 O.S.1951 § 6, and said:

"We have construed this section of the statute numerous times, and consistently have held that interest is recoverable where the right to recover vests at a particular time, and the amount sued for is capable of being made certain."

We think the proper rule governing this case was laid down in Mayor v. Weaver, 207 Okl. 464, 250 P.2d 844, 845. There we quoted from Blackwell, E. & S. W. Ry. Co. v. Bebout, 19 Okl. 63, 91 P. 877, 878, as follows:

"The judgment of the court must follow the verdict, and where the verdict is general and for a sum in gross, and the question of interest was not reserved by the court, and there is nothing in the record to indicate that the jury omitted interest, it will be presumed that it is embraced in the amount of their finding, and the court cannot add interest to the amount found by the verdict of the jury."

As governing cases in which the court may add interest to a verdict, we quoted the following rule from the early case of St. Louis, E. R. & W. R. Co. v. Oliver, 17 Okl. 589, 87 P. 423, 427:

"* * * Where it is clearly apparent from the verdict, or the verdict and instructions of the court, that the jury did not, in the assessment of the amount of the recovery, include interest, *and it is further clearly apparent that the party recovering is entitled to interest in addition to the amount stated in the verdict, and the rate is fixed by law or made certain by the terms of the contract, and the date from which and to which interest should be computed is clearly and unquestionably ascertainable from the face of the verdict or from uncontroverted facts of record,* the court may lawfully compute or calculate the interest, and add such sum to the amount allowed by the jury, and render judgment for the aggregate sum."

In the present case, the matter of allowing interest on plaintiff's claim was not reserved by the court. On the contrary, it was submitted to the jury by the court's Instruction No. "(9)", which told the jury that if it found for the plaintiff, its verdict should be " * * * whatever sum, in your judgment the evidence in this case shows that plaintiff is entitled to receive * * *, if any, but not to exceed $962.00 with 6 percent interest from June 14, 1956." The quoted date was the date plaintiff executed the assignment of the leases to defendant, but the evidence did not establish when said assignment reached, or was delivered to, defendant, nor did it establish, with any degree of exactness or certainty, just when plaintiff's request for payment was received by defendant, or came to his attention, or when he (according to plaintiff's evidence) agreed to comply therewith. We think that on the basis of the record before us, the trial court erred, under the above quoted rules, in adding interest to the sum allowed plaintiff by the jury's verdict.

As we have found the other errors assigned by defendant insufficient cause for reversing the judgment of the trial court, said judgment is hereby affirmed on condition that within ten (10) days after said court's receipt of the mandate herein, plaintiff file in said court a remittitur of the interest allowed him by said judgment; otherwise, said judgment is vacated, and a new trial is ordered.

DAVISON, C. J., WILLIAMS, V. C. J., and HALLEY, JACKSON and BERRY, JJ., concur.

WELCH, J., concurs in result.