S. Samuel Di Falco, S.
The sole issue in this proceeding for the settlement of the executors is presented by a claim filed by the members of a partnership engaged in the real estate business. The objectants claim that they are entitled to real estate brokerage commissions in the sum of $24,750 for procuring a purchaser for premises owned by the decedent and sold by the executors. The executors rejected the claim.
There are three executors engaged in the administration of the estate, but the corporate executor, with the consent of the two individual executors, handled all of the transactions relating to the sale of the real property. There is no question in this case of an exclusive listing agreement. It appears that prior to the time when the executors definitively decided to sell the property, the objectants learned of the possible sale of the property, and they communicated very frequently with an officer of the corporate executor with respect to the property. The objectants obviously were anxious to participate in the transaction and to earn the brokerage fee. There is nothing in the present record which would indicate that the objectants had any basis for assuming any agency prior to a public listing of the property by the corporate executor. In December, 1956, the corporate executor sent mimeographed, material to a number of real estate brokers. That material has been referred to as the listing letter. It describes the premises, states the rentals of the various apartments and the payroll. It states that the property was *14 being offered for sale “ subject to change in price, prior sale, errors and omissions or withdrawal from the market without notice.” The price is stated to be $1,600,000. The listing letter contains the following statement: ‘ ‘ We will pay a full commission only to the broker effecting a sale, but this offering is not to be construed as an employment. Broker’s commission is to be deemed earned only as, if and when title actually passes and full consideration is paid. No offer will be accepted unless broker submitting the offer shall have executed and delivered the owner’s form of Brokerage Contract.” It concludes with the statement that for further details “ or submission of bona fide offers ”, one should communicate with the real estate department of the corporate executor, whose address, telephone number and extension were listed, together with the name of an officer, L. J. Tucker.
The objectants had been in communication with a different officer of the corporate executor, T. Charles Sullivan, assistant treasurer who was in charge of the trust real estate section. It is conceded that Mr. Sullivan was duly authorized to act on behalf of the estate. Unfortunately he is now dead and the only available testimony of the transactions between him and the objectants is that given by one of the objectants. The objectants had long been anxious to learn the offering price of the premises, but they were never informed of the price, or even of the decision to sell, until they received the listing letter on the morning of December 19, 1956. One of the objectants testified that immediately upon receiving the listing letter, he communicated with one of his clients with whom he had discussed the property theretofore and that he was told by the client to go ahead and close the deal at that price. The objectant testified that immediately after talking with the proposed purchaser, he called Mr. Sullivan but did not then reach him. The objectant says that he talked with Mr. Sullivan on the telephone at approximately 2 o’clock that same afternoon. In ansAver to the request to state in full and in detail the conversation he had with Mr. Sullivan at that time, the objectant testified: “I said, ‘Will you close with one million six? ’ And he said, ‘ Yes.’ and I said, ‘ You have it. We’ll close the deal. I will call you back in five minutes and tell you the laAyyer. ’ ” The objectant was asked by his counsel: “ Was anything else said by either you or by Mr. Sullivan in this conversation? ” He replied in the negative. The objectant did not mention the name of any purchaser at that time. He testified that he thereupon called the purchaser and was given the name of the laAvyer who would handle the transaction. He said that he called Mr. Sullivan *15 several times and that his partner called him, but that he had no success until about four o’clock that afternoon when the witness said that he talked with Mr. Sullivan by telephone, telling bim that he had the name of the buyer’s lawyer. At this time Mr. Sullivan is said to have replied that he was sorry but the objectant was too late because they had just closed the deal. The witness said that his reply was that the deal had been closed at 2 o’clock by him.
It appears that another broker who had received the listing letter had submitted an offer in writing on behalf of a wholly different purchaser than the one proposed by the objectants. The letter disclosed the name of the purchaser, the total price, an agreement to pay all cash above the existing mortgage and the amount of the down payment. The time stamp shows that it was received by the corporate executor at 3:28 p.m. on December 19, 1956. That offer was accepted by the corporate executor prior to the telephone conversation in which the objectant disclosed the name of the lawyer who would act for the undisclosed purchaser.
One of the exhibits which easts some doubt upon the object-ant’s version of the conversations is a letter sent by the witness to the corporate executor. It is dated December 19, 1956, the date of the alleged conversations, and was received by the corporate executor two days later. It reads: “ Confirming conversation with Mr. Sullivan’s Secretary, your price of $1,600,000 on your contract terms is acceptable to our customer. Will you kindly advise us as soon as the contract is prepared. ’ ’ (Emphasis added.) This letter was obviously prepared after the brokers had learned that the transaction had been closed with another purchaser. It will be noted that in this letter the brokers did not pretend to have had any commitment from Mr. Sullivan, but only a conversation with his secretary. This letter was addressed to the bank but directed to the attention of Mr. Sullivan. It is difficult to conceive of this statement as merely a minor mistake respecting names. Under all of the circumstances, this letter must be regarded as significant.
However, even on the testimony of the objectants, they have failed to establish their right to be compensated by the estate. “ To earn a commission it was incumbent on [the broker] to show that it had been hired by defendant as a broker and had produced a purchaser able and Avilling to enter into a contract for the purchase of the property upon all essential terms satisfactory to the seller.” (Globus Realty Corp. v. Fleetwood Terrace, 275 App. Div. 34, affd. 301 N. Y. 783.) The broker must establish ‘1 that there was such meeting of the minds of *16 the parties on all essential terms of the agreement to purchase as to warrant payment of commissions to plaintiff as broker.” (Id., p. 35; House v. Hornburg, 267 App. Div. 557, affd. 294 N. Y. 750; Sibbald v. Bethlehem Iron Co., 83 N. Y. 378, 382.) “ A meeting of the minds is essential not only on the price but on all the other terms of the contract. ’ ’ (Saum v. Capital Realty Development Corp., 268 N. Y. 335, 342.) Although in the conventional case of principal and broker, the latter does not assume the risk of performance by the owner and the purchaser but earns his compensation when he produces a purchaser ready, able and willing to buy on the owner’s terms, nevertheless, the contract between the broker and his principal may expressly provide that payment is to be conditioned upon complete performance of the contract (Wagner v. Derecktor, 306 N. Y. 386, 390), or it may contain other valid restrictions or limitations upon the broker’s right to compensation (Saum v. Capital Realty Development Corp., supra). When the contract states in plain and unequivocal language the terms and conditions upon which the commissions are payable, the agreement of the parties governs. (Heller & Henretig v. 3620-168th St., 302 N. Y. 326.) Of course, an owner will not be permitted to take advantage of his own wrongful act or fault and where he is the cause of the failure to perform conditions upon which his liability depends, he cannot take advantage of his arbitrary or capricious obstruction of performance. (Amies v. Wesnofske, 255 N. Y. 156, 162; Wagner v. Derecktor, supra; Mengel v. Lawrence, 276 App. Div. 180; O’Connor-Sullivan v. Otto, 283 App. Div. 269, 271.)
Applying these principles to the pending case, it is clear that the objectants have failed to establish their right to commissions. First, there was no employment of the objectants as brokers. The listing letter was plainly a circular, and it was addressed to a large number of brokers. In plain and unequivocal language it stated that it was not to be construed as an employment and it stated the terms on which a commission could be earned. The objectants did not comply with those conditions. There was no waiver on the part of the executor of these written conditions.
Secondly, even if we accept the objectant’s testimony of the conversation with the bank officer, all that it amounts to is the bank’s statement that it would accept the price at which it had already publicly listed the property and the broker’s statement that a deal would be closed at a later time. The listing letter stated only the price. It did not mention any terms on which it would accept payment. It did not say whether it was to be *17 all cash or payable in installments or by mortgages. The objectants did not state any terms upon which payment would be made, or even the person or corporation who would make the purchase. The witness who testified did not say that the deal was closed then and there. If he had, the bank officer might well have asked on what terms the deal was considered closed. What he said was, “ We’ll close the deal.” The fair meaning of his words is that there was still something essential to be done.
The statement that a broker must produce a purchaser ready and willing to buy on the owner’s terms “ implies and involves the agreement of buyer and seller, the meeting of their minds, produced by the agency of the broker.” (Sibbald v. Bethlehem Iron Co., 83 N. Y. 378, 381, supra.) Here, the buyer and seller never had any discussion at all. The executor never even knew who the prospective buyer was. The broker never discussed any terms of sale. There may be cases where the offering of the property so specified all essential terms that little remained for discussion except formal details. (Cf. Mengel v. Lawrence, supra.) Even in such a case, however, a broker has not completed performance of his contract of hiring unless the natural progress of the transaction was thwarted by the owner’s wrongful refusal to discuss the terms with the buyer. In the pending case, there was no refusal by the executor to discuss anything that was offered. There was simply no offer to discuss terms.
The objections are, therefore, overruled. There being no objection to the request to abandon the specified securities, and it appearing in the account that such securities have no value, the application is granted. Submit decree on notice settling the account accordingly.