KATSUNORI IKEOKA AND ONAMI IKEOKA *v.* JOHN H. KONG AND BANK OF HAWAII AND FIRST NATIONAL BANK OF HAWAII.

No. 4269.

OCTOBER 24, 1963.

TSUKIYAMA, C.J., CASSIDY, WIRTZ, LEWIS AND MIZUHA, JJ.

OPINION OF THE COURT BY MIZUHA, J.

Plaintiffs-appellants, Katsunori Ikeoka and his mother, Onami Ikeoka, residents of Honolulu, instituted this suit, alleging in their complaint that defendant-appellee, John H. Kong of Hilo, a real estate broker, was indebted to them in the sum of $2,500 for monies paid to him. Defendant entered a general denial and by way of counter-claim, alleged that the plaintiffs were indebted to him for the unpaid balance of broker's commissions in the amount of $3,900. Trial was had without a jury and judgment rendered in favor of defendant in the sum of $3,900.

Plaintiff Katsunori Ikeoka, acting for himself and his mother, Onami Ikeoka, authorized defendant, under an "Exclusive Authorization to Sell" contract dated June 27, 1960, to sell within 180 days, certain properties situated in Hilo, Hawaii, for the sum of $64,000 to be paid in the following manner: "25% Down Payment, Balance on agreement of sale. Balance payable in 5 years."

Under the terms of said "Exclusive Authorization to Sell" the plaintiffs promised "to pay" defendant "upon any such sale being effected or contracted for, * * * for services in securing such purchaser, a commission of Ten per cent (10%) of the selling price; * * *."

On November 28, 1960 plaintiff Ikeoka went to Hilo to negotiate for the sale of the property in question. Defendant had two prospective buyers. Agreement on the total price could not be reached between plaintiff and the first prospective buyer. On December 2, 1960, plaintiff was introduced to Dr. Chock, treasurer and stockholder of Kauwe's Land & Research Development, Inc., hereinafter referred to as "corporation," the second prospective buyer.

Acting in behalf of the corporation Dr. Chock agreed with plaintiff as to the price, the schedule of payments and other terms that were to be incorporated in an Agreement of Sale.[1] Dr. Chock then handed to plaintiff a check, dated

[1] Direct examination of Mr. Ikeoka:

"Q And did you reach an agreement on the sale's price?
"A Yes.
"Q What was that amount?
"A $64,000.00.
"Q Did you reach any agreement as to how this money was to be paid?
"A Yes.
"Q And what agreement did you reach in that?
"A As you say, well, we raised up the downpayment for, if I remember correctly, but anyhow the money terms was agreed on. I had no objection to the money.
"Q Do you recall agreeing on an increased downpayment instead of 25 per cent agreeing to 29 per cent you paid down?
"A If I look through the Agreement Of Sale I could be definite."

Cross-examination of Mr. Ikeoka:

"Q And according to the agreement then, it was $5,000.00 down, is that correct?
"A No, it was not $5,000.00 down. That was more or less, what you call it, going through.
"Q $5,000.00 down upon the execution of the Agreement Of Sale, is that correct?
"A That was to be added on to the downpayment.
"Q That's right. And you agreed that on January 15th, the following year, that $13,500.00 was to be paid, is that correct?
"A Yes.
"Q That's what you agreed with Dr. Chock?
"A Yes.
"Q And you also agreed then as to the terms of the payment, right?
"A Yes.
"Q Five equal installments?
"A Yes.
"Q At 6½ per cent interest?
"A Yes."

December 2, 1960, for $5,000 as earnest money, to be applied to the purchase price. Immediately thereafter an Agreement of Sale was drafted by an attorney, according to the terms and conditions agreed upon by plaintiff and the purchaser. The written Agreement of Sale was then presented to Dr. Chock. After execution of the agreement by the officers of the corporation, the Agreement of Sale was accepted by the plaintiff, who then cashed the check which was deposited as earnest money, and paid defendant one-half or $2,500 on account of his commission. At the time plaintiff Ikeoka accepted the Agreement of Sale, he did not object to any of the terms and conditions contained therein as being contrary to what he had previously orally agreed, but claims he accepted the document subject to the approval of his attorney. Plaintiff informed defendant that he was taking the document with him to Honolulu where he and his mother were to sign it and send it back no later than Wednesday (next). It was never executed by the plaintiffs.

Upon his return to Honolulu plaintiff was advised by his attorney that the Agreement of Sale was not satisfactory because it favored the buyer and not the seller; that the officers of the corporation should be included in their individual capacities in the Agreement of Sale as guarantors because if the corporation became bankrupt, he (appellant) "may not get his money back." A modified Agreement of Sale was drafted by appellant's attorney wherein it provided, among other provisions, for the officers to sign as officers of the corporation, as well as in their individual capacities as guarantors, and for the consent to any assignment of the Agreement of Sale. This Agreement of Sale was rejected by the corporation and its officers. Since the parties were not advancing in their negotiations, the corporation submitted to plaintiff an Agreement of Sale drafted by its own attorney, which

plaintiff categorically rejected. Thereafter, upon the advice of his attorney, appellant returned the $5,000 to the corporation and demanded the return of $2,500 from defendant, paid him as part payment on account of his commission.

The basic question involved in this case is whether the defendant, a real estate broker by profession, has earned and therefore is entitled to his commission pursuant to his employment contract.

Plaintiffs contend that the original Agreement of Sale was never signed by them, therefore the commission was not earned, for "no sale of the property in question was effected" and "no contract of sale was entered into" according to the "Exclusive Authorization to Sell."

Plaintiff Ikeoka testified that he had orally agreed to the terms and conditions of the sale, but that he informed both defendant and Dr. Chock that the Agreement of Sale was accepted by him, subject to the approval of his attorney. Both Dr. Chock and appellee denied that appellant made such a statement to them. Plaintiffs argue that this disputed fact "can only be resolved on the basis of credibility of witnesses," and that the testimony of plaintiff Ikeoka should be believed, and if there is any conflict, then it should be resolved in favor of plaintiffs.

The trial judge found that plaintiff Ikeoka did not make his acceptance of the Agreement of Sale subject to the condition that his attorney must approve the agreement.

"* * * Mr. Ikeoka dealt directly with the purchaser and did not object to or inquire about the purchaser's financial responsibility; * * *.

＊　＊　＊　＊　＊　＊　＊　＊　＊

"No objection was made that the purchaser was not ready, able, and willing to purchase. Mr. Kong [defendant] and Mr. Ikeoka [plaintiff] were satisfied at

the time of the negotiation as to the ability of the Corporation to perform the contract, and the seller agreed to sell it to the Corporation. The terms of sale, down payment, deferred payments, and interest were all discussed by Mr. Kong, Ikeoka, Kauwe and Dr. Chock before the contract was drafted, and * * * the terms and conditions, especially payments therein, were fixed by the seller, * * *."

The trial judge also found that the plaintiff accepted the check for $5,000 as earnest money, cashed the same, and paid one-half of it, the sum of $2,500, to defendant as partial payment for his services.

H.R.C.P., Rule 52(a) provides that "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. * * *" After a careful review of the evidence, we cannot say that we are left with a definite and firm conviction that a mistake has been committed by the trial court and that these findings are "clearly erroneous." *Filipino Federation of America, Inc.* v. *Cubico,* 46 Haw. 353, 380 P.2d 488; *Peine* v. *Murphy,* 46 Haw. 233, 377 P.2d 708; *Miller* v. *Loo,* 43 Haw. 76; *Lima* v. *Tomasa,* 42 Haw. 478; *Lum* v. *Stevens,* 42 Haw. 286; *Hawaii Builders Supply Co.* v. *Kaneta,* 42 Haw. 111.

It is elementary that a real estate broker's right to his commissions depends primarily upon the terms of the employment contract where there has been a failure to consummate a sale. *Barnard* v. *Monnot,* 3 Keyes (N.Y.) 203, 33 How. Pr. 440; *Staula* v. *Carrol,* 312 Mass. 693, 45 N.E.2d 822; 4 Williston, *Contracts,* § 1030A (Rev. ed.); 8 Am. Jur., *Brokers,* § 179.

There is a distinction between the employment of a broker to find or procure a purchaser of property, and the employment of a broker to effect or contract for the sale of such property. Under the first type of employment con-

tract, a broker is required only to produce a purchaser ready, able and willing to perform upon the terms fixed, in order to be entitled to his commissions. We have before us the second type of employment contract where the broker claims his commissions not only after he has found a purchaser who is ready, able and willing to buy upon the terms fixed by the seller, but also after he has effected a sale or procured from the prospective purchaser a binding contract of purchase on the terms and conditions specified in the contract of employment. In order to effect a sale or contract for a sale under this type of employment contract, something more that a mere verbal agreement coupled with the payment of earnest money is necessary. In the absence of contractual stipulation to the contrary, the sale must be effected, purchase money paid and title legally or equitably transferred, or if this were not done, the broker must secure the execution and delivery by the purchaser of a binding written contract of purchase, upon the terms and conditions agreed by the seller, which the seller could enforce, if necessary. *Livingston* v. *Malever,* 103 Fla. 200, 137 So. 113; *Malever* v. *Livingston,* 95 Fla. 272, 116 So. 15; *Wiggins Adm'r.* v. *Wilson,* 55 Fla. 346, 45 So. 1011; *Ormsby* v. *Graham,* 123 Iowa 202, 98 N.W. 724.

The evidence in the instant case clearly indicates that the negotiations for the sale of the property had gone further than the mere production of a purchaser, ready, able and willing to buy upon the terms authorized in the "Exclusive Authorization to Sell." The broker did bring the purchaser and sellers together, and after arriving at an oral agreement as to the terms and conditions of the sale of the property which were fixed by the sellers, the same agreement was reduced to writing. The Agreement of Sale, after execution by the purchaser, was accepted by the sellers, and all that remained to be done was the signing of the same by the sellers. The trial judge found that

the broker had procured an Agreement of Sale in which the minds of the sellers and purchaser had met on all terms deemed by them to be essential thereto. There was no express understanding in the "Exclusive Authorization to Sell" that "the vendor was to pay nothing, unless he should choose to make the sale" *Kock* v. *Emmerling,* 63 U.S. (22 How.) 69, 75, 16 L. Ed. 253, nor was there a reservation that any Agreement of Sale before signature by the plaintiffs was subject to the approval of their attorney.

Ordinarily, under the type of contract before us, a broker employed to sell property is not entitled to compensation until a valid, binding and enforceable contract of purchase has been entered into. The language created a condition precedent to the vendor's liability to pay. *Kolodziejczak* v. *Bak,* 220 Mich. 274, 189 N.W. 929; *Tant* v. *Gee,* 348 Mo. 633, 154 S.W.2d 745; *Amies* v. *Wesnofske,* 255 N.Y. 156, 174 N.E. 436; *Estate of Boley,* 211 Wis. 431, 248 N.W. 452; 8 Am. Jur., *Brokers,* § 168; 12 C.J.S., *Brokers,* § 89. But there is a recognized exception to this general rule. Where the seller has not reserved full liberty of action, including the right to refuse on any ground whatsoever, "the broker is entitled to his compensation upon the completion of the negotiations which he undertook, irrespective of whether or not the contract negotiated is ever actually consummated or whether the failure to complete the contract is due to the default or refusal of the employer * * * so long as the failure to carry it through to a successful completion is not due to any fault of the broker or so long as he has not been guilty of fraud or bad faith. * * *" 8 Am. Jur., *Brokers,* § 179. See also *Staula* v. *Carrol, supra; Stern* v. *Gepo Realty Corp.,* 289 N.Y. 274, 45 N.E.2d 440; *Tanenbaum* v. *Boehm,* 202 N.Y. 293, 95 N.E. 708; *Sibbald* v. *The Bethlehem Iron Co.,* 83 N.Y. 378, 38 Am. Rep. 441; *Collins* v. *Vickter Manor, Inc.,* 47 Cal. 2d 875, 306 P.2d 783; *McAlinden* v. *Nelson,* 121 Cal. App.

2d 136, 262 P.2d 627; *Penney* v. *Speake*, 256 Ala. 359, 54 So. 2d 709; *Knowles* v. *Henderson*, 156 Fla. 31, 22 So. 2d 384; 12 C.J.S., *Brokers*, § 95.

"* * * [I]f a promisor himself is the cause of the failure of performance * * * of a condition upon which his own liability depends, he cannot take advantage of the failure." 5 Williston, *Contracts*, § 677 (Rev. ed. 1961). If a promisor, without legal excuse, prevents the happening of an event upon which his liability depends, he cannot thus be allowed to defeat the promise. *Fitzpatrick* v. *Gilson*, 176 Mass. 477, 57 N.E. 1000; *Patterson* v. *Meyerhofer*, 204 N.Y. 96, 97 N.E. 472; *Middleton* v. *Thompson*, 163 Pa. 112, 29 Atl. 796; *Fischer* v. *Bell*, 91 Ind. 243; *Peet* v. *Sherwood*, 43 Minn. 447, 45 N.W. 859; *Cheatham* v. *Yarbrough*, 90 Tenn. 77, 15 S.W. 1076; *United States* v. *United Engineering Co.*, 234 U.S. 236, 34 S. Ct. 843, 58 L. Ed. 1294. "* * * [N]o one can avail himself of the non-performance of a condition precedent, who has himself occasioned its non-performance." *Sibbald* v. *The Bethlehem Iron Co.*, *supra* at 384. *Young* v. *Hunter*, 6 N.Y. 203. The doctrine is purely one of waiver. *Amies* v. *Wesnofske*, *supra*; *Livingston* v. *Malever*, *supra*; 5 Williston, *Contracts*, § 678 (Rev. ed. 1961).

The great weight of authority, as expressed in the Restatement, *Agency*, § 445, comment *e*, is that "Although a promise by a principal is expressed to be conditional upon the execution of an enforceable contract between the principal and the customer, a principal is subject to liability if the broker procures a customer who is willing to enter into an enforceable contract with the principal on the principal's terms and whose failure to do so is because of the principal's refusal to execute such agreement. Likewise, a promise to pay a commission if the broker 'effects a sale' or 'negotiates a sale' ordinarily subjects the principal to liability not only if a transfer of title is effected but

also * * * if a suitable customer is produced who is ready, willing and able to execute such a contract." See also *Costilla Land Co.* v. *Robinson,* 238 F.2d 105 (10th Cir. 1956); *Dickey* v. *Waggoner,* 108 Colo. 197, 114 P.2d 1097; *Spence* v. *Lawrence,* 337 Mass. 355, 149 N.E.2d 379; *Marschalk* v. *Weber,* 11 N.J. Super. 16, 77 A.2d 505; 12 C.J.S., *Brokers,* § 95.

Generally, where the seller has good grounds for refusing to complete the sale and does so, the broker is not entitled to commissions. *Buckner* v. *Tweed,* 157 F.2d 211 (D.C. Cir. 1946), *cert. denied* 330 U.S. 825, 67 S. Ct. 866, 91 L. Ed. 1275, *rehearing denied* 330 U.S. 856, 67 S. Ct. 1092, 91 L. Ed. 1297; *Smith* v. *Gibraltar Oil Co.,* 254 F.2d 518 (2d Cir. 1958); *Rifkind* v. *Turner,* 52 A.2d 501 (D.C. App. 1947); *Reeser* v. *Crawford,* 147 Okla. 53, 294 Pac. 181; *Best* v. *Kelley,* 22 Wash. 2d 257, 155 P.2d 794; *Blunt* v. *Wentland,* 250 Iowa 607, 93 N.W.2d 735; 12 C.J.S., *Brokers,* § 95. On the other hand, unless the broker and his employer have expressly stipulated to the contrary, the basis for refusal "must not be arbitrary, capricious, unreasonable, wrongful or fraudulent." 12 C.J.S., *Brokers,* § 95. See also *Kock* v. *Emmerling, supra; Collins* v. *Vickter Manor, Inc., supra; Notkins* v. *Pashalinski,* 83 Conn. 458, 76 Atl. 1104; *Wendle* v. *Palmer,* 77 Conn. 12, 58 Atl. 12; *Mengel* v. *Lawrence,* 276 App. Div. 180, 93 N.Y.S.2d 443; *Wagner* v. *Derecktor,* 306 N.Y. 386, 118 N.E.2d 570; *O'Connor-Sullivan, Inc.* v. *Otto,* 283 App. Div. 269, 127 N.Y.S.2d 373; *In re Hepburn's Estate,* 30 Misc. 2d 12, 211 N.Y.S.2d 311. However, regardless of whether the principal gave one or no reasons at the time of his refusal to complete the transaction, a reason not mentioned to the broker at the time of refusal cannot later be asserted in defense of a suit for commissions. *Lathrop* v. *Gauger,* 127 Cal. App. 2d 754, 274 P.2d 730; *Rainier* v. *Champion Container Co.,* 294 F.2d 96 (3d Cir. 1961); 12 C.J.S., *Brokers,* § 95.

Plaintiffs contend that there are at least two valid reasons to support his refusal to execute the Agreement of Sale. "First, the Agreement of Sale * * * did not provide for consent by the seller to a mortgage or assignment of the purchaser's interest in the property, and second, the Agreement of Sale did not provide for adequate security for the deferred payments which amounted to 71% of the total purchase price."

Although no specific objections were raised by plaintiff Ikeoka to the original Agreement of Sale at the time he accepted it in Hilo, this court is satisfied that the additional provisions incorporated in the modified Agreement of Sale drafted by plaintiffs' attorney about a month later and submitted to the corporation sufficiently raises their objections to enable them to assert same in the instant case.

These reasons were not presented separately and independently as grounds for refusal to sign the original Agreement of Sale. They were incorporated in a modified Agreement of Sale which was rejected by the purchaser on the ground that the personal guaranty provision for the payment of installments was ridiculous.[2] We are unable to determine from the evidence whether the purchaser would have accepted the consent to assignment provision, had it

[2] Direct examination of defendant:
"Q   And now what did you do with that Agreement Of Sale when you brought it back to Hilo?
"A   Gave it to Dr. Chock.
"Q   And what did Dr. Chock tell you?
"A   Week afterwards, he says, 'Why should I sign? That's as guarantor.' I says, 'I don't know.' Then he brought that to his attorney. His attorney or the Kauwe's Land & Research attorney. He says, 'I will not sign it.'
*      *      *      *      *      *      *      *      *
"Q   So the Agreement Of Sale was made by Walter Chuck was brought over to the hotel. Then what happened?
"A   Then I brought it home. Then the next day I gave it to Dr. Chock. He read it. He started to laugh and he says, well, he will see his attorney. At that time I don't know who was the attorney. Then I wait a week. I said, 'What happened?' Then he says they're going to make a new one. 'Give it to me, I send it down to Mr. Ikeoka.'"

been proposed independently from the personal guaranty provision. No testimony on this provision was offered by the plantiffs during the trial.

Nevertheless, we will separately consider each reason advanced by the plaintiffs. Plaintiffs argue that the consent to assignment provision is important to the seller "as a matter of self-protection," and though "he might be well satisfied with the solvency and integrity of his purchasers, he might not be at all satisfied with the solvency of purchaser's assignees * * *." Consent to assignment features in Agreements of Sale are dependent upon each individual case and situation. Here, the argument with reference to the solvency or integrity of the purchaser's assignees is unimpressive inasmuch as appellants retain title to the property under the Agreement of Sale until the entire purchase price is paid and all interim payments received by them will be retained in case of default by the purchaser or their assignees.[3] Provisions of a similar nature were written into the Agreement of Sale under which plaintiffs themselves acquired possession of the property. Hence the omission of such a consent provision cannot be deemed a reasonable ground for the plaintiffs refusal to sign the Agreement of Sale.

Although the court in *Best* v. *Kelley, supra,* held that where a broker had knowledge of facts sufficient to put

---

[3] Agreement of Sale (Defendant's Exhibit 2 in evidence).

"C.3. That in the event the Buyer or its assigns shall refuse or fail to pay the balance of said total purchase price or complete said purchase as hereinabove provided or otherwise breach the terms of this Agreement the Sellers, among other things, may:

"(a) Bring an action for damages for breach of contract; or

"(b) Tender a proper deed, duly executed by the Sellers, and sue the Buyer or its assigns for the balance of the total purchase price; or

"(c) Cancel this Agreement and retain all payments made on account hereof to the Sellers by the Buyer or its assigns as and for liquidated damages.

"C.4. All covenants and agreements herein contained shall extend to and be obligatory upon the heirs, executors, administrators, successors and assigns of the respective parties."

him on notice at the time of employment of a defect in title which subsequently prevented consummation of the transaction, he was not entitled to his commission, appellants depend upon other statements of that court with reference to security for deferred payments on an assignment of a lease, in support of their argument that the Agreement of Sale did not provide for adequate security for the deferred payments. In discussing the earnest money receipt purporting to embody the terms of the contemplated sale, which provided that the deferred purchase money "be secured by the furniture and equipment now in the building on said property," the court stated at page 261 that no provision was made "* * * in the earnest money receipt that the deferred payments be secured by the most valuable portion of the property, namely, the lease. It would seem that the furniture, if separated from the lease, could not be adequate security for the balance due. It is not to be imagined that appellant intended to leave twenty-five thousand dollars in deferred payments absolutely unsecured. * * *"

The security argument in the *Best* case is distinguishable in that under the Agreement of Sale we have before us, the sellers are the holders of the legal title of 64 acres of land without partial release, until full payment is made. In the event of failure on the part of the corporation to perform according to the terms, appellants have the right to cancel the agreement and retain all payments made as liquidated damages. In other words, the security for the deferred payments is the land described in the agreement. (See footnote 2.) Whereas, in the *Best* case, the security for the deferred payments was manifestly inadequate inasmuch as it was secured merely by the furniture and equipment, a minor part of the subject matter of the sale and not "secured by the most valuable portion of the property, namely, the lease."

The trial judge found that plaintiff's refusal to consummate the sale was predicated on the ground that "if the Corporation became bankrupt he cannot get his money back."[4] This objection to a corporation being a purchaser was presumably raised during the trial in support of plaintiff's contention that the Agreement of Sale did not provide adequate security for deferred payments. After a careful examination of the Agreement of Sale, we find that plaintiffs insistence that the officers of the corporation sign in their individual capacities as guarantors is unreasonable. Under the agreement, the sellers retain title to the land until the full purchase price is paid and there is no release clause for any acreage to the purchaser at any time during the entire period of the agreement. (See footnote 2.) The evidence clearly shows that the corporation had paid $5,000 and it was ready, willing and able to meet

---

4 Direct examination of Mr. Ikeoka:

"Q And did he [Mr. Ikeoka's attorney] check it [Defendant's Exhibit 2] over for you?

"A Then he explained to me the bad points because when I deal with a corporation that I had no guarantee that in case they go bankrupt that I would get any money back or anything like that. Because he said the corporation is something that they're not liable for the personal property and all that, that they could even if they had a million in asset, the next day they could withdraw the whole thing. He explained to me all the bad points about dealing with a corporation. * * *"

Cross-examination of Mr. Ikeoka:

"Q Well, isn't it true, Mr. Ikeoka, that this Agreement Of Sale was, in so far as you're concerned, was satisfactory only upon the advice of your attorney after you went back that he told you that the buyer is a corporation; therefore, you should have the personal signature, is that correct?

"A As a—sign as guarantors.

"Q But up to that time—point—when you agreed with Mr. Chock, they explained to you that their corporation is purchasing this land, is that correct?

"A I didn't know nothing about corporation. I knew it was a corporation, but I didn't know a corporation could file bankruptcy right the next day if they have no—"

Examination of Mr. Ikeoka [appellant] by the Court:

"Q And now in so far as the provision as to payments were concerned, downpayment and installment payment—

"A That was all agreeable.

the further payment of $13,500 on January 15, 1961, and all subsequent payments thereafter, pursuant to the terms of the sale agreement. See *Driscoll* v. *Bunar,* 328 Mass. 398, 103 N.E.2d 809. No evidence was offered by plaintiffs to show that the purchaser was financially unable to make the payments called for in the Agreement of Sale. "While it is true that in the ordinary suit to recover a commission the broker must establish the financial ability of the purchaser, yet where the seller accepts the purchaser and his offer and then prevents the consummation of the sale by his own default the burden is upon him, in order to defeat the broker's right to compensation, to show the purchaser's want of ability.* * *" *Shaffer* v. *Berger,* 81 A.2d 469 (D.C. App.) ; *Dotson* v. *Milliken,* 27 D.C. App. 500, *aff'd* 209 U.S. 237, 28 S. Ct. 489, 52 L. Ed. 768; *Heyward* v. *Kirsch,* 77 A.2d 551 (D.C. App.) ; *Stokes* v. *Wolf,* 137 Md. 393, 112 Atl. 566. See also *Jacobs* v. *Rothschild,* 200 Okla. 599, 197 P.2d 951; *McFarland* v. *Lillard,* 2 Ind. App. 160, 28 N.E. 229.

When the terms of the Agreement of Sale were agreed upon and a written agreement embodying the said terms was prepared and signed by the purchaser, defendant had accomplished all that he could under the "Exclusive Au-

---

"Q You understood that?
"A Yes.
"Q You agreed to that?
"A Yes.
"Q And in so far as at the time that Kauwe and Sato executed that Agreement Of Sale prepared by Mr. Ushijima [Defendant's Exhibit 2], were you satisfied as to the terms then of payment and all of that?
"A No. The payment, yes. The payment part, yes, but as far as the other legal angle I have to show 'em to my attorney.
"Q But as far as the payment is concerned, you didn't have to show your attorney or did you ever show it to your attorney?
"A The payment part I figured they agreed to my terms. That was o.k. But then I found out about corporation, how they could file bankruptcy, this and that, and they are not liable for personal property, you cannot attach the personal property, or anything like that, then I told Mr. Chuck [appellant's attorney] that, oh, hell, if I going to borrow money from the bank I going get stuck if they shove 'em down my throat. I would get stuck and I would lose everything."

thorization to Sell" in order to earn the 10 per cent commission. Defendant's duty as a broker consisted "in bringing the minds of the vendor and the vendee to an agreement. He could do no more. He had no power to execute a contract, to pay the money for the one side, to convey the land on the part of the other, or to compel the performance by either of their duties. The plaintiff produced a purchaser, willing and ready to accept the terms of the defendant, and able to perform the obligation on his part. He had then earned his commissions, and it would be a singular conclusion of the law that the refusal of his employer to complete the bargain, should destroy his right to them. * * *" *Barnard* v. *Monnot, supra* at 441. See also *Tracy* v. *O'Neill,* 103 Conn. 693, 131 Atl. 417; *McGavock* v. *Woodlief,* 61 U.S. (20 How.) 221, 15 L. Ed. 884; *Kock* v. *Emmerling, supra; Hart* v. *Pierce,* 98 Fla. 1087, 125 So. 243; *Walker & McClelland* v. *Chancey,* 96 Fla. 82, 117 So. 705.

In *Home Banking & Realty Co.* v. *Baum,* 85 Conn. 383, 386-87, 82 Atl. 970, 971, a real estate broker was authorized by defendant and wife in writing " 'to sell my property [for $5,800] * * * and do hereby agree to pay a commission of 2% on the sale price, *if sold or exchanged at price satisfactory to me.'* " (Emphasis added.) Since a buyer could not be found at the above stated price, the broker was authorized "to sell at a price less than $5,800." Broker found buyers who were ready, able and willing, and who offered to purchase the property at the price of $5,600 and and on terms not mentioned in the written authorization. Defendants accepted the terms and agreed to sign a deed for the transfer of their property. Whereupon buyers deposited $1,106.82 with the broker. Then after some delay, defendants refused to convey title unless the buyers paid $5,800 in cash. The court stated in rendering judgment for the broker, that "It is well settled that a broker in

whose hands real estate has been placed for sale by its owner is entitled to the commission agreed upon when his efforts have resulted in a sale, or in procuring a customer who is ready, able, and willing to buy upon the terms prescribed by the owner." Furthermore, the court held that "* * * the broker had done all that it could. It rendered the stipulated service, and through no fault upon its part the matter was not completed. The efforts of the plaintiff were rendered futile by the refusal of the defendants to convey their property, and therefore they should not be allowed to say that the plaintiff had not performed its contract."

The Oklahoma Supreme Court was presented with a similar situation in *Jacobs* v. *Rothschild, supra.* The owners gave to the broker a written contract of employment to sell an apartment house. A buyer was secured by the broker who was ready, able and willing to purchase on the owners' terms, and who executed a contract for the purchase and made an earnest money payment. The seller objected neither to the contract for purchase nor to the buyer but he refused to sign the contract. Upon further refusal on seller's part to sign the contract, broker instituted his suit alleging that he was entitled to his commissions. In reversing judgment for the defendant, the court stated: "* * * To decline to execute the contract without valid reason was arbitrary. * * * *" *Jacobs* v. *Rothschild, supra* at 601.

In *Livingston* v. *Malever, supra,* the court stated that the refusal of the owner to go through with the sale of land to a prospective purchaser procured by his broker constituted a waiver, on the owner's part, of full performance by the broker, of his contract to "sell" the land, and the broker was therefore entitled to maintain an action to recover his compensation, notwithstanding the fact that an actual sale was not consummated. See also *Walker*

*& McClelland* v. *Chancey, supra; Hutchins & Co.* v. *Sherman,* 82 Fla. 167, 89 So. 430.

We find that the subsequent refusal on the part of the plaintiffs to complete the transaction by executing the Agreement of Sale, the terms of which were previously agreed upon, was based on unreasonable and arbitrary grounds. Therefore, we hold that plaintiffs by their conduct, waived the condition precedent for the payment of the commissions in the employment contract and are estopped from declaring that the sale was not "contracted for" by the defendant. 8 Am. Jur., *Brokers,* § 180; 12 C.J.S., *Brokers,* § 95(a) (2) ; *Mengel* v. *Lawrence, supra; Livingston* v. *Malever, supra; Wagner* v. *Derecktor, supra.*

Judgment affirmed.

*Walter G. Chuck* and *Albert W. Evensen* for plaintiffs-appellants.

*Ushijima & Nakamoto (John T. Ushijima)* for defendant-appellee.

### DISSENTING OPINION OF LEWIS, J., WITH WHOM CASSIDY, J., JOINS.

To recover, the broker had to show that he had earned a commission in the manner specified by the terms of his employment, or that his client (hereinafter referred to as the "seller" or the "sellers")[1] had prevented him from fully performing by arbitrary action or other fault, without any fault on the part of the broker or the customer found by the broker (hereinafter referred to as the "buyer"). *Walker* v. *Chancey,* 96 Fla. 82, 117 So. 705; *Livingston* v. *Malever,* 103 Fla. 200, 137 So. 113; *Dickey*

---

[1] Literally, there were two sellers involved, Katsunori Ikeoka and his mother. However, the former was active on behalf of both and it is convenient at times to refer to the "seller," meaning Katsunori Ikeoka.

v. *Waggoner*, 108 Colo. 197, 114 P.2d 1097; *Middleton* v. *Thompson*, 163 Pa. 112, 29 Atl. 796; *Cheatham* v. *Yarbrough*, 90 Tenn. 77, 15 S.W. 1076; *Sibbald* v. *Bethlehem Iron Co.*, 83 N.Y. 378, 383; *Blunt* v. *Wentland*, 250 Iowa 607, 93 N.W.2d 735; *Tracy* v. *O'Neill*, 103 Conn. 693, 131 Atl. 417; Restatement, *Agency*, § 445e.

Under the terms of the printed "Exclusive Authorization to Sell," Exhibit 1 (hereinafter referred to as the "authorization"), the seller promised to pay the broker his commission "upon any such sale being effected or contracted for * * *." We are not concerned with the word "effected" as there was no cash sale contemplated. The authorization had this to say about a sale being "contracted for":

"* * * I, the undersigned principal, hereby employ said Agent as my sole agent and give said Agent the exclusive right to sell, * * * in cash, *or on the terms set forth below, or* for such lesser price, or upon such other terms *as may be hereafter agreed upon by me in writing,* or by cable or wireless * * *.

"I hereby agree and bind myself, upon demand, to convey said described real property, * * * to any purchaser secured therefor by said Agent * * * for the cash price above stated, *or on the terms set forth on the reverse side hereof, or* for such lesser price, or upon such other terms *as may be hereafter agreed upon by me in writing,* or by cable or wireless as aforesaid." (Emphasis added.)

Under the heading "Special Conditions" there was typewritten: "25% Down Payment, Balance on Agreement of Sale." Below this, in handwriting, the following appeared: "Balance payable in 5 years." The reverse side of the document was blank. The terms to be contained in the agreement of sale were not set forth in the document or attached thereto.

All that the broker pleaded was that:

"* * * Defendant secured a buyer, within the time allowed in the said Exclusive Authorization to Sell, who was ready, willing and able to buy the said land, and an Agreement of Sale had been prepared, a copy of which is attached hereto as Exhibit 'B' and by reference made a part hereof, but the Plaintiffs refused to sell or enter into an agreement to sell the said land to the buyer secured by the Defendant."

The theory of the counterclaim, therefore, was that the broker need only have secured a buyer "ready, willing and able to buy * * *." The broker did not plead that the sale had been "contracted for." While alleging that the seller refused to enter into an agreement of sale, he did not allege that such refusal was wrongful or that the attached Exhibit B contained all the terms to which the seller was entitled. This Exhibit B was admitted in evidence as Defendant's Exhibit 2 and I shall refer to it by that number. It showed on its face that it was executed on December 2, 1960 by the buyer, Kauwe's Land & Research Development, Inc., but was not executed by the seller.

There is a difference between the employment of a broker to find a purchaser and the employment of a broker to procure a contract of sale, as the court points out. This difference is explained in *Malever* v. *Livingston,* 95 Fla. 272, 116 So. 15; *Livingston* v. *Malever, supra,* 103 Fla. 200, 137 So. 113; *Ormsby* v. *Graham,* 123 Iowa 202, 98 N.W. 724.

It has been said that even though the commission is conditional upon the execution of an enforceable contract, the seller is liable if the broker procures a customer who is willing to enter into an enforceable contract on the seller's terms and whose failure to do so is because of the seller's refusal to execute such agreement. *Smith* v.

*Gibraltar Oil Co.*, 254 F.2d 518, 522 (10th Cir.), quoting Restatement, *Agency*, § 445e. However, this is merely recognition of the principle that the seller cannot by his arbitrary action prevent the broker from earning his commission.

The requirement that the sale be "contracted for" is a condition precedent, which is set aside if it remains unfulfilled because of fault of the seller. *Cf., Amies* v. *Wesnofske*, 255 N.Y. 156, 161-63, 174 N.E. 436, 437-38. This is in the class of conditions precedent which can only be performed by the promisor or with his cooperation. *Cf., Moore* v. *Scott Stamp & Coin Co.*, 178 F.2d 3 (2d Cir.); *Wolbarsht* v. *Donnelly*, 302 Mass. 568, 20 N.E.2d 415. One who prevents the happening of a condition precedent upon which his liability depends cannot avail himself of the condition. 5 Williston, *Contracts*, § 677 (3d ed.); 12 Am. Jur., *Contracts*, § 329; Restatement, *Contracts*, § 295. However, the burden is on the promisee to show the prevention. *Wolbarsht* v. *Donnelly, supra.*

There is a question in some of the cases as to the nature of the contract required. 8 Am. Jur., *Brokers*, § 173. I have no doubt that the words "contracted for" require that a valid, enforceable contract shall have been entered into. *Ormsby* v. *Graham, supra*, 123 Iowa 202, 98 N.W. 724, 729; *Massie* v. *Chatom*, 163 Cal. 772, 127 Pac. 56; *Folinsbee* v. *Sawyer*, 157 N.Y. 196, 51 N.E. 994; *Measell* v. *Baruch*, 152 Va. 460, 147 S.E. 203.

The counterclaim in this case incorporated by reference the terms of the authorization. As seen, the allegations of the counterclaim were insufficient to show compliance with those terms. The seller interposed as the first defense to the counterclaim that it "fails to state a claim upon which relief can be granted." No application was made under H.R.C.P., Rule 12(d), for a separate hearing of this matter before trial. No objection was made at

the trial based on the insufficiency of the pleadings in relation to the evidence offered. This defense therefore is to be judged in the light of the evidence adduced, in all respects as if the broker had properly alleged that Exhibit 2, which the buyer executed, contained all the terms to which the seller was entitled and the sale would have been "contracted for" but for the wrongful refusal of the seller to execute the same on his part.[2]

I now come to the meaning of the words "Balance on Agreement of Sale" appearing in the authorization. The broker contends that all that the seller had a right to expect under this document was an agreement of sale setting out the down payment and deferred payments, the interest rate, and such additional provisions as the seller might show were implied under the usual practice. I do not agree. The broker did not prove that there was a usage under which the words "Balance on Agreement of Sale" in themselves defined the content of the agreement of sale. The burden of proof is on one who relies on a usage or custom to plead and prove its existence. 55 Am. Jur., *Usages and Customs,* § 51; *cf., Francone* v. *McClay,* 41 Haw. 72.

The seller denied the allegations of the counterclaim and further alleged that the buyer "refused and failed to execute an Agreement of Sale containing the normal and customary conditions of such agreements." If the latter allegation be taken as a concession that there were identifiable "normal and customary conditions" it likewise was an assertion that Exhibit 2 did not fall within the usage. And if usage supplied the terms to be included in the agreement of sale the burden was on the broker, who relied on Exhibit 2, to show that it conformed to the usage.

---

[2] H.R.C.P., Rule 15(b), provides that: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." See *Godoy* v. *County of Hawaii,* 44 Haw. 312, 321, 354 P.2d 78, 83.

The quoted allegation of the seller was not an affirmative defense. It was not pleaded as a separate defense. It merely negatived the broker's case. It therefore was surplusage[3] except as it admitted the possibility of identifying the "normal and customary conditions."

It also is appropriate to consider whether the words "Balance on Agreement of Sale" have a meaning in the case law whereby the terms to be included are routine. The contrary is true. The preparation of an agreement of sale involves discretion and constitutes the practice of law, though a few courts recognize that standard forms may be used in certain ways without practicing law. See *Martineau* v. *Gresser,* 88 Ohio L. Abs. 550, 182 N.E.2d 48; *Oregon State Bar* v. *Security Escrows, Inc.,* 377 P.2d 334 (Ore.) ; *State ex rel. Indiana State Bar* v. *Indiana Real Estate Ass'n,* 191 N.E.2d 711 (Ind.).

In this case we lack evidence that the words "Balance on Agreement of Sale" contemplated use of a standard form. All we know is that on an earlier occasion Mr. Ikeoka, presently the seller, when purchasing the land in question had executed an agreement in the form of Exhibit 2. As purchaser on the former occasion he was in a different position from that which he occupied on this occasion, as his attorney pointed out to him on his return to Honolulu. There is no evidence of any agreement for use of this form at the time the authorization was entered into.

This then is a case in which at the time of the authorization terms remained to be negotiated. The broker cannot recover if there was no meeting of the minds on the remaining terms. *Ormsby* v. *Graham, supra,* 123 Iowa 202, 98 N.W. 724; *Costilla Land Co.* v. *Robinson,* 238 F.2d 105 (10th Cir.) ; *Best* v. *Kelley,* 22 Wash. 2d 257, 155 P.2d

---

[3] See 2 Moore, *Federal Practice,* § 827(3) (2d ed.).

794; *Greene* v. *Waggoner Refining Co.*, 278 S.W. 492 (Tex. Civ. App.); *Jacobs* v. *Schneider*, 152 Cal. App. 2d 452, 313 P.2d 142. This principle applies as well to the terms of any formal contract contemplated. *Mengel* v. *Lawrence*, 276 App. Div. 180, 93 N.Y.S.2d 443, 446.

According to some cases it is the duty of the seller to negotiate in good faith the remaining terms, and if the broker shows that the buyer was ready to meet all reasonable terms he may recover though the parties did not agree on the remaining terms. *Mengel* v. *Lawrence, supra; Costilla Land Co.* v. *Robinson, supra.* According to other authorities it is a complete defense that the buyer and seller never got together to negotiate the remaining terms. Restatement, *Agency*, § 445d, Illustration 5; *Ormsby* v. *Graham, supra.* It is unnecessary to resolve this point, as the seller on the argument conceded that the seller must act reasonably.

The basis of the trial court's holding was:

"* * * The purchaser accepted the offer to sell the properties on the terms proposed by the sellers. * * *

"It is the general rule that a broker who produces a purchaser able, ready and willing to buy on the terms fixed by the seller is entitled to his commission. * * *

"* * * The Defendant had no legal right to deprive the Plaintiff of his commission by capriciously and unreasonably refusing to consummate this sale. * * *"

The evidence shows, as stated by the trial court, "that the consideration for sale of the properties and the terms of payment had been agreed upon." That is, the seller and buyer reached agreement not only on the price of $64,000 but also on a down payment of approximately 29%, of which $5,000 was tendered at the time in the form of a check and the remaining $13,500 was to be paid on January 15, 1961. The balance of $45,500 was to be paid with 6½% interest over a five-year period. These nego-

tiations were oral and the evidence shows that the parties at the time contemplated a formal contract. Discussion was had as to who should draw it up.

A Hilo attorney was selected to draft the agreement of sale. The seller and buyer each had an attorney, the seller in Honolulu and the buyer in Hilo. However, the attorney selected to draw it up was the one who previously had drawn the agreement of sale covering acquisition by Mr. Ikeoka—presently the seller—of the land in question, and according to the broker's testimony that was why he was selected. Asked whether this attorney was his attorney, the broker so testified. The seller testified that the broker told him all agreements of sale were the same. There was no finding as to whether the broker so stated.

It is undisputed that this Hilo attorney supplied the terms and provisions of Exhibit 2, other than the price and terms of sale above noted. The trial court in its decision, after referring to the price and terms of sale orally negotiated, stated: "There is, however, an irreconcilable conflict as to whether or not any other provisions of Defendant's Exhibit 2 in evidence had been agreed upon." After summarizing the conflicting evidence the court resolved the conflict to the extent of finding that the seller did not expressly reserve the right to consult his own attorney, basing this finding on the corroboration of the broker's testimony by Dr. Chock, the buyer's treasurer, and upon the seller's admission that he had not told the Hilo attorney who drafted Exhibit 2 that his own attorney must approve it. At a later point in the decision the court below said that "his [seller's] actions, in cashing the [$5,000] check and paying $2,500.00 to Mr. John H. Kong [the broker], speak more eloquently than his testimony in Court as to what actually transpired on December 2, 1960." This again was with reference to the question whether the seller expressly reserved the right to consult his own attorney.

Therefore on this record we must take it that the seller, despite his testimony that he informed both the broker and Dr. Chock that if his Honolulu attorney did not approve the agreement a new one would be drawn up, did not expressly reserve the right to consult his own attorney. The trial court's finding is not "clearly erroneous." (H.R.C.P., Rule 52(a).) However, this finding is material only to the question whether the complete terms were approved by the seller by acquiescence on his part in the form in which Exhibit 2 was drafted, a question taken up later in this opinion.

·. There was no contract between the buyer and seller. The parties intended a formal agreement of sale, as in *Measell* v. *Baruch* and *Massie* v. *Chatom, supra.* When Exhibit 2 was drafted it supplied additional provisions, not previously discussed between the buyer and seller. Moreover, it was drafted in such form as not to be binding unless both parties signed. *Cf., Shortridge* v. *Ghio,* 253 S.W.2d 838 (Mo. App.).

Since the sale was not "contracted for" (the majority makes no holding that it was), the question of prevention of performance of the condition precedent that it be "contracted for" is the turning point. The first matter to be considered is: Were the negotiations as to the terms of the formal contract completed, so far as the broker was concerned, when he secured the buyer's execution of Exhibit 2? The seller contends that since he had not executed Exhibit 2 it was not too late for him to raise objections to its provisions. The broker contends that the seller acquiesced in the provisions of Exhibit 2, that full agreement was reached on all the terms of the contract, and that the broker could not be deprived of his commission by the seller's refusal to execute the agreement.

As a matter of general principle, a seller who has negotiated and agreed to terms which are complete—leaving

nothing for further negotiations—is liable for the broker's commission when a suitable buyer has been found to contract upon those terms, though the seller subsequently experiences a change of mind. *Cf., Notkins* v. *Pashalinski,* 83 Conn. 458, 76 Atl. 1104; *Buckner* v. *Tweed,* 157 F.2d 211 (D.C. Cir.). However, the trial court made no finding on the question whether the seller acquiesced in the provisions of Exhibit 2 and thus completed the terms which in the original authorization were incomplete. While holding that the buyer "accepted * * * the terms proposed by the sellers" the trial court so held on the erroneous assumption that Exhibit 1, the original authorization, contained all of the terms.

There was testimony of the broker that the seller read Exhibit 2 while sitting in the reception room of the Hilo attorney's office and then said he was satisfied. But there was testimony of the seller that the broker told him all agreements of sale were the same. Hence if the seller did express his satisfaction it may have amounted to nothing more than concurrence that the price and other terms of sale which previously had been discussed were correctly stated in Exhibit 2, a point on which there is no disagreement. While the payment of $2,500 to the broker after cashing of the $5,000 check is evidence of the seller's acquiescence in Exhibit 2, and there also was testimony of the broker that the seller said the document would be executed in Honolulu and sent back "no later than Wednesday" and the balance of the commission would be paid January 15, there are other circumstances to be considered.

The evidence shows that on the seller's return to Honolulu he consulted his attorney and was advised the agreement was not in satisfactory form. The broker learned this when he came to Honolulu. He testified this was two weeks later but it evidently was earlier. He talked with the seller's attorney and was informed this attorney

was preparing a new draft of the agreement. He testified that the attorney asked him if Dr. Chock would sign as a guarantor. "So I said, 'That, I do not know. But if you want to make up one, I'll bring it back and give it to him.'" The next day he received a new draft from the seller's attorney, executed by the seller on December 9, 1960. He brought this draft back to Hilo, and gave it to Dr. Chock, the buyer's treasurer. This was Exhibit I. An attorney in Hilo, not the attorney who prepared Exhibit 2 but the one who was attorney for the buyer corporation, was consulted by Dr. Chock about Exhibit I, and still another draft was prepared. This was Exhibit II, executed by the buyer on December 20, 1960. The new draft was given to the broker who mailed it to the seller. At the time of seller's demand for return of the $2,500 which the seller had paid the broker, the seller through his attorney, by letter of January 10, 1961, informed the broker that this last draft was unacceptable.

Thus the broker participated in additional negotiations after the date—December 2, 1960—when he says the negotiations were completed. The trial court should have considered this. As in *Folinsbee* v. *Sawyer, supra,* 157 N.Y. 196, 51 N.E. 994, the "subsequent acts [of the broker] were not consistent with his claim at the trial." Distinguishable is *Peet* v. *Sherwood,* 43 Minn. 447, 45 N.W. 859, in which the loan sought was prevented by a defect in the principal's title. In the present case the question turns on the understanding of the parties as to the point at which all negotiations were completed, as to which the broker's subsequent actions are clearly relevant. *Folinsbee* v. *Sawyer, supra.*

Moreover, a question of law is presented by the seller's contention that by reason of his not having executed Exhibit 2 it was not too late for him to raise objections after his return to Honolulu. Where it is provided by a broker's

authorization that the sale shall be upon the terms there set out or "on any other terms to which the seller may consent in writing" the seller may defend on the ground the terms he allegedly accepted were not in writing. *Marschalk* v. *Weber,* 11 N.J. Super. 16, 25, 77 A.2d 505, 509. The broker's authorization in the present case contained such a provision. Since the seller had signed nothing but the original incomplete authorization and was not bound to accept any terms to which he had not agreed in writing he did not have to expressly reserve the right to consult his own attorney.

But as further held in *Marschalk,* the protection of a provision concerning consent in writing may be waived. Whether there was such waiver has not been determined.

"* * * A waiver takes place where a man dispenses with the performance of something which he has a right to exact and is a technical doctrine introduced and applied by the courts for the purpose of defeating forfeitures. Estoppel is the inhibition to assert a right from the mischief that has resulted or might follow. Waiver belongs to the family of estoppel yet they are distinguishable. * * *" *Silverhorn* v. *Pacific Mut. Life Ins. Co.,* 24 Haw. 366, 371-72.

"The question of whether or not a given state of facts brings the case within principles of the law of waiver is not always an easy one to determine. In *Pabst Brewing Co.* v. *Milwaukee,* 126 Wis. 110, 116, a statement of the principles which should govern in such cases, and which meets with our approval, is as follows: 'It would seem that the more satisfactory ground on which to support the doctrine of waiver is that it is a rule of judicial policy, the legal outgrowth of judicial abhorrence, so to speak, of a person's taking inconsistent positions and gaining advantages thereby through the aid of courts,—a rule by which, regardless

of absence of any element of estoppel or consideration as those terms are popularly understood, the maxim that one shall not be permitted to blow hot, then with advantage to himself turn and blow cold, within limits sanctioned by long experience as required for the due administration of justice, has been prohibitively applied. * * *' " *Scott* v. *Pilipo,* 25 Haw. 386, 391.

It is not apparent that the seller enjoyed any advantage, or that the broker suffered any prejudice, by reason of the seller's acquiescence in the provisions of Exhibit 2 while in Hilo on December 2, 1960, if there was such acquiescence. The broker's agency had not expired at that time and did not expire until 180 days after June 27, 1960, that is, December 24, 1960. The situation in *Marschalk* was different, as the sellers there maintained their acquiescence until a date after the expiration of the agency. Here the broker learned of the seller's dissatisfaction when his exclusive agency had not yet expired.

Even if a waiver may be found where there is no element of estoppel, the present record does not make out a case of waiver. By his participation in the negotiations subsequent to December 2, 1960 without any claim that he already had earned his fee, the broker may have done the seller an injustice instead of the other way around. This should have been considered by the trial court.

Coming now to the reasonableness of the seller's demands, it is to be noted that this matter is not reached if, upon consideration of all the circumstances, it is concluded that the seller's failure to execute Exhibit 2 was contrary to his arrangements with the broker. If, however, by reason of the broker's acquiescence in further negotiations or by reason of the provisions of the authorization requiring that all terms be in writing, the seller was within his rights in conducting further negotiations, we come to the question of the reasonableness of the seller's demands in these further negotiations.

The broker does not take the position that the seller should have accepted the last draft, Exhibit II, prepared by the buyer's own attorney. It provided for partial releases as payment was made, at the rate of $1,000 per acre, the down payment also to be applied in this manner. The seller did not yet have fee simple title to the property, which was being acquired from one Souza under an agreement of sale. This was pointed out in the letter of January 10, 1961 written by seller's attorney to the broker, informing him that the draft prepared by the buyer was unsatisfactory. It was known to the broker, who handled the purchase from Souza. Indeed, he testified that at the beginning of the negotiations with the buyer on December 2, 1960 he explained to the buyer that there could be no partial release provision because Souza had not been paid off. Dr. Chock, the buyer's treasurer, was one of those who was told this, according to the broker's testimony. But Dr. Chock, according to his testimony, was aware that the buyer's attorney was putting a partial release provision in Exhibit II. No finding was made concerning the alleged information given the buyer on December 2, 1960 that there could be no partial release provision.

As seen, it is the position of the broker that the first draft, Exhibit 2, contained all the terms the seller had a right to expect. This draft did not contain two provisions the inclusion of which was satisfactory to the buyer upon proposal by the seller, as demonstrated upon comparison of the drafts prepared by the attorneys representing the respective parties, Exhibits I and II. One of these omissions in Exhibit 2, as advanced by the seller in argument though not in his briefs, concerned the charges to be paid by the buyer. All that Exhibit 2 provided was that the buyer would pay "real property taxes" beginning with the assessment for the year 1961. The authorization

had provided for prorating as of closing of "any and all rents, taxes, insurance premiums, water rates, and other carrying charges." At the very least the seller was entitled to have the agreement of sale contain the language of the authorization as to prorating of charges. The draft prepared by the attorney for the seller, Exhibit I, required the buyer to pay "all real property taxes and all assessments of every kind and all sewer and water rates, and all other rates and charges which shall hereafter be legally payable upon or with respect to said premises, whether charged against the Vendors or the Purchaser." This was set out verbatim in the draft prepared by the attorney for the buyer, Exhibit II.

Another provision proposed by the seller and satisfactory to the buyer was one requiring the consent of the seller for any sale, assignment, mortgage or other disposition of the premises, or of the agreement, or of the interest of the purchaser therein. To this the buyer, in his draft, added the above-mentioned partial release provision which the seller obviously could not accept.

The case would stand differently had the buyer, without the addition of the partial release provision, rejected the seller's demand that the officers of the corporate buyer individually guarantee performance. It then would be plain that the negotiations broke down over the guarantee provision, and the turning point would be the broker's acquiescence in the making of this demand.

As the record stands the negotiations broke down on two points, and while one was advanced by the seller the other point, the one advanced by the buyer, was independent of the first point and unless explained leads to the conclusion that the buyer was not ready to contract on acceptable terms.

True, the buyer before consulting its own attorney did sign Exhibit 2, the first draft, but that did not contain

the complete prorating provision to which the seller was entitled. It also did not contain the consent provision which was acceptable to the buyer and has not been shown to have been unusual or more than the seller was entitled to. The seller's further negotiations on these two points have not been shown to have been unreasonable.

I therefore have concluded that the judgment for the broker on the counterclaim is not sustained by the trial court's decision and there should be a reversal and remand for a new trial. As to the claim of the seller for return of the $2,500 paid the broker out of the $5,000 check, together with incidental expenses, it may be doubtful whether he has brought himself within the doctrine of recovery for money paid under mistake. However, in view of the court's opinion I deem it unnecessary to pursue this matter.